UNOCAL CORPORATION, Union Oil Company of California, and Union Exploration Corporation f/k/a Union Exploration Partners Ltd., Appellants,

v.

DICKINSON RESOURCES, INC., Appellee.

No. B14–92–01118–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 23, 1994.

Rehearing Overruled Dec. 22, 1994.

Leymon L. Solomon, David C. Holmes, W. James Kronzer, David M. Gunn, Houston, for appellants.

Kevin Dubose, James H. Pearson, Thomas A. Dickinson, Donald B. Henderson, Kyle R. Sears, Houston, for appellee.

Before ROBERTSON, SEARS and DRAUGHN, JJ.

## OPINION

DRAUGHN, Justice.

This case concerns a prospect concept for gas well development in Louisiana. A jury awarded damages to appellee, Dickinson Resources, Inc. ("DRI"), for fraud, negligence, gross negligence, breach of confidential relationship, misappropriation of a trade secret, and quantum meruit. Appellants, Unocal Corporation, Union Oil Company of California, and Union Exploration Corporation f/k/a Union Exploration Partners, Ltd. (collectively "Unocal," unless designated separately), bring eight points of error and a cross point alleging breach of contract. DRI also cross appeals contending the trial court erred in refusing to enter judgment for the punitive damages found by the jury. It also raises a cross point contending it is entitled to recovery under the Texas Deceptive Trade Practices Act ("DTPA"). *See* TEX.BUS. & COM. CODE ANN. §§ 17.41–.63 (Vernon 1987 & Supp.1994).

Arthur Dickinson is an independent geologist who is president and sole shareholder of DRI. On behalf of DRI, he generates and sells prospect concepts, which are theories about the location of new oil and gas deposits. From 1984 to 1990, DRI worked on developing a prospect concept off the shore of Vermilion Parish, Louisiana, referred to as the "Tigre Point Prospect." This area is also referred to as "Vermilion Block 7."

Unocal is a group of associated oil companies who have operated in Louisiana for years. Unocal has as many as 200 to 300 producing wells in Vermilion Parish, and it has drilled as many as 800 other wells in the same area.

In attempting to market its Tigre Point prospect, DRI first contacted a company named Peltex and persuaded Peltex to acquire a lease on a tract of land in its prospect area. Peltex never drilled on the land, and DRI later obtained a release so that it could pursue the prospect with other companies. Next, DRI contacted Quintana Petroleum Corporation, which acquired 5,000 acres in DRI's prospect area and drilled an 18,000 foot well. The well resulted in a dry hole. Dickinson contended Quintana chose the well site, which was not the site he would have chosen. After drilling the unsuccessful well, Quintana allowed its leases to expire. DRI contacted Unocal and requested it pay the rentals and take over the Quintana leases, but Unocal declined.

Ultimately, Dickinson showed DRI's prospect concept to some thirty companies without success. DRI then made an informal agreement with a company called Edge Petroleum to cover one-half the development cost for the prospect, contingent on DRI finding another company to cover the other half. Dickinson was aware of Unocal's general interest in the area. In early 1990, acting through Edge, Dickinson contacted Unocal employee Tim Bennett to discuss the Tigre Point prospect.[1] Bennett was uninterested at first, but later agreed to meet with Dickinson at Unocal's office in Lafayette, Louisiana.

The meeting occurred on January 9, 1990. At the beginning of the meeting, Bennett presented Dickinson with Unocal's waiver form for his signature. Dickinson signed the waiver, and then presented his prospect idea. The meeting lasted about one and a half hours. The parties showed each other their maps, seismic data and well logs. Bennett and Dickinson did not agree about the geological interpretation of the data. Bennett informed Dickinson Unocal was not interested in his prospect, and Dickinson left, taking his data and maps with him.

In April 1990, the state of Louisiana offered for lease several tracts, including some covering Vermilion Block 7. Unocal acquired three tracts, on which it was the only bidder at the public lease sale, for $540,000. DRI immediately learned of the leases and contacted Unocal, contending these tracts are the same leases recommended in its prospect

1. When this dispute arose, Unocal obtained a release from Edge, who consequently was not a party to this suit.

and that Unocal owed DRI compensation. Unocal's position was, and continues to be, that it did not appropriate DRI's concept, but developed its own concept independently.

In June 1990, DRI filed suit against Unocal, seeking damages. Because of the pending litigation, Unocal never drilled any wells on the disputed leases and never received any income from them. Instead, Unocal allowed the leases to revert to the state for non-payment of rentals in April 1991. DRI contends that due to current market conditions, even though the leases are available, it would be unable to find any company willing to finance an expensive, deep gas well such as required by its prospect. Thus, DRI claimed it has been damaged by the loss of the potential profits from future production from such a well.

■ At trial, Unocal presented testimony concerning its investigation of the specific area in dispute. Shortly after the January 1990 meeting with DRI, Unocal received the results of a paleo study begun in 1988. It also received new seismic data in March 1990. Unocal contends it based its decision to acquire the state leases on this new information. DRI attacked this contention and presented evidence that Unocal did not have a prospect in the area of the leases until after it met with Dickinson. DRI presented expert testimony as to the projected amount of gas reserves in the ground under the leased tracts and their value. Dickinson testified the compensation DRI sought for its prospect idea was to have been 10% of the cost of the leases plus a 3% overriding royalty interest in the leases, i.e., a percentage of the gross well production. The jury found Unocal had breached its confidential relationship with DRI, and it was guilty of negligence, gross negligence, fraud, and misappropriation of a trade secret. In answer to question ten, the jury found actual damages on DRI's tort claims in the amount of $1,376,000. In addition, it found quantum meruit damages in the amount of $54,000 in answer to question nine. While the jury found punitive damages in the amount of $2,600,000, the trial court refused to award them, applying Louisiana law making punitive damages unavailable.[2]

We find Unocal's first two points of error are dispositive of this appeal. In its first point of error, Unocal contends that because DRI executed the waiver agreement, it relinquished its right to bring this suit. Unocal asks this court to enforce the waiver agreement. In point two, Unocal asserts that the trial court erred in not finding waiver as a matter of law, rather than submitting the waiver issue to the jury in question twelve. It asks us to set aside the jury's answer denying waiver.

The waiver agreement, executed before the meeting between Dickinson and Bennett began, referenced the "Review of Data Zone 1 Vermilion Area," and stated:

> This letter is written in connection with the review by Union Exploration Partners, Ltd. ("UXP") or Union Oil Company of California ("Union") of certain geologic and/or geophysical data and/or land and leasehold information provided by your company.

> You agree to waive any claim demand or cause of action, either legal or equitable, which may be asserted against UXP or Union concerning use of any data or information of a proprietary or confidential nature which is provided for review by UXP or Union. Such review by UXP or Union shall not preclude any oil and gas operation or activity subsequent to the review in any area which was subject to the review, or in any other area.

Dickinson signed the waiver, accepting these terms on behalf of DRI.

■ On appeal, DRI contends the waiver omits one of the defendants because it makes no mention of Unocal Corporation. For several reasons, we reject this argument. First,

---

**2.** Where only Texas law is cited in this opinion, we have applied the presumption that the law of Texas as the forum state is identical to the law of Louisiana. This presumption applies when the applicability and substance of the foreign state's laws have not been pleaded and proved on each issue. *See Gevison v. Manhattan Const. Co. of Oklahoma,* 449 S.W.2d 458, 465 n. 2 (Tex.1969); Tex.R.Civ.Evid. 202. In the absence of our attention being directed to contrary Louisiana law on the issues addressed here, we cite to Texas law.

**608**

the waiver appears on the letterhead of Unocal Corporation, and specifically identifies the corporation and its Oil & Gas Division. DRI acknowledged the three entities are "all closely affiliated entities." There was no effort at trial to distinguish these companies. Unocal argues that if a distinction among the parties had been raised at trial, it could have disposed of it instead of relying on its defense that none of the entities had wronged DRI. The trial testimony generally concerned the generic acronym "Unocal" without separating any of the entities, or used the names interchangeably.[3] DRI's initial demand letter on behalf of Edge Petroleum asserted "Union Exploration (UNOCAL), in fact, has acquired several tracts" within its claimed prospect area.[4]

■ The test in determining the parties included in a waiver agreement is whether a stranger could readily identify the released party. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419–20 (Tex.1984). This waiver does not merely refer to a "general class" of actors, as in *Duncan. See id.* (release naming "any other corporations or persons whomsoever" does not discharge general class); *see also Winkler v. Kirkwood Atrium Office Park*, 816 S.W.2d 111, 113–14 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (waiver naming "the Club" covered "all individuals and entities involved"). We find Unocal Corporation could be identified from the document and hold the waiver covers all defendants.

■ We also reject DRI's contention that the waiver cannot be enforced because it is not supported by consideration. Dickinson testified "if I wanted to show my deal, I had to sign that form." Unocal refers to the waiver as "the price of admission to the meeting." To an independent geologist attempting to sell his prospect, this meeting had tangible value. In addition, Unocal showed Dickinson its own seismic and paleo data, which had cost large sums of money. The meeting was a benefit to DRI and a detriment to Unocal. *See Dodson v. Stevens Transport*, 776 S.W.2d 800, 804–05 (Tex. App.—Dallas 1989, no writ) (consideration present where plaintiff had to sign release as precondition to riding in defendant's truck). We conclude the waiver is supported by consideration.

Originally, DRI raised affirmative defenses to the waiver attacking its validity. It contended Dickinson was not provided an opportunity to seek legal advice before signing and that his signature was fraudulently induced. DRI acknowledged in its pleadings that the waiver "purports to waive all of the Plaintiff's claims, of any kind, against the Defendants."

At trial, however, DRI abandoned these defenses, conceding Dickinson's signature was voluntary. Dickinson testified he had "no problem" with signing the waiver, and that he not only gave Unocal permission to use the geologic and geophysical data he presented, but in fact he "encouraged them." DRI instead adopted a theory at trial attacking the waiver's scope, arguing the waiver did not cover the claims brought in this suit.

■ In construing a written contract, the primary concern of the court is to ascertain the objective intent of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *Derr Const. Co. v. City of Houston*, 846 S.W.2d 854, 861 (Tex.App.—Houston [14th Dist.] 1992, no writ). If a written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not am-

3. Unocal is also an acronym for Union Oil Company of California. The witnesses and counsel frequently confused the names of the companies. For example, one witness used the names interchangeably when asked who paid his salary:

A: Unocal. That's what appears on my check stub.
Q: Is that—is that all that appears?
A: Union Exploration Company.
Q: Okay. Is it Unocal Exploration Company or Union Exploration?
A: Union Exploration Company.
Q: Okay. And what is your position with Unocal?

4. The reply to this demand was written by Tim Bennett's supervisor, again on Unocal Corporation letterhead, and was executed as follows:

Union Exploration Partners, Ltd., Limited Partnership
By: Union Oil Co. of California
dba Unocal
M.F. Miller
Vice President

biguous and the court will construe the contract as a matter of law. *Coker*, 650 S.W.2d at 393. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *Id.* at 394; *Sage Street Assoc. v. Northdale Const. Co.*, 863 S.W.2d 438, 445 (Tex.1993). DRI never pled ambiguity. We find the agreement can be given a certain meaning and is therefore unambiguous.

■ DRI attempted to separate "data" or "information" from the "prospect concept" or "idea." DRI argues Dickinson agreed to sign the waiver because the data was commercially available and could be independently acquired by Unocal, but that it never intended to waive any rights to its prospect idea. DRI contends its interpretation is the only one that makes sense. DRI's interpretation that the waiver only included data already available to the public ignores the language specifically mentioning "data or information of a proprietary or confidential nature." DRI's position in effect concedes there is only one meaning of the waiver's language. Because the data DRI presented at the meeting was available to Unocal from other sources, the only confidential or proprietary matter conveyed at the meeting was DRI's prospect concept.

■ DRI's entire argument concerns the interpretation of the terms "data" and "information" contained in the waiver. It does not address the waiver's last sentence: "Such review by UXP or Union *shall not preclude any oil and gas operation* or activity subsequent to the review *in any area* which was subject to the review, or in any other area." (emphasis added). This plain, unambiguous language allowed Unocal to proceed with its acquisition of leases in Vermilion Block 7 for potential oil and gas operations. In constru-

ing contracts, we must examine and consider the entire writing to harmonize and give effect to all the provisions of the contract so that none are rendered meaningless. *Coker*, 650 S.W.2d at 393. The only possible interpretation harmonizing the waiver's last sentence with the rest of the document is to conclude Unocal was authorized to proceed with development in the area of DRI's prospect. This court cannot change the bargain that DRI made because DRI now recognizes it failed to protect its own interests.[5]

Public policy supports enforcement of the waiver. Unocal vehemently argues that disregarding a waiver agreement such as this one would have a chilling effect on the oil and gas industry. A waiver's purpose is "to transfer risk." *Dresser Indus.*, 853 S.W.2d at 508. DRI knew there was a risk that Unocal might not want to make a deal. Dickinson was attempting to sell a prospect he had unsuccessfully attempted to sell to thirty other companies. Under these conditions, it was reasonable for him to sign a waiver and to bear the risk that the meeting would fail. From Unocal's perspective, it is easy to see why it required the waiver form. It sought to prevent exactly what occurred in this case: a claim that it "stole" an idea, prospect, data or information, whatever it is called. Without such agreements, an exploration company such as Unocal would never meet with a vendor such as DRI because of the risk of claims like the kind DRI has made here.

A vendor can protect itself in other ways. It could lease the acreage covering the prospect before divulging any information. It could ask for a confidentiality agreement. It could condition the meeting on a written agreement for a percentage of the oil company's future operation. Or, it could bargain

---

5. We find DRI's other attacks on enforcement of the waiver unpersuasive. First, Unocal has not waived the right to have this court interpret the unambiguous waiver. Secondly, having submitted a question on breach of contract and damages, Unocal was not required to submit a jury question on meeting of the minds. *See* Tex. R.Civ.P. 277 (court shall submit broad-form questions); Tex.R.Civ.P. 279. Finally, the express negligence rule does not apply under these facts. *See Dresser Indus., Inc. v. Page Petroleum*, 853

S.W.2d 505, 507–08 (Tex.1993) (express negligence doctrine applies to those releases where a party, in advance, is relieved of liability for damages from its own negligence arising out of a transaction). Moreover, Louisiana law does not recognize the express negligence rule. *Resolution Trust Corp. v. Gasper–Virgillio*, 27 F.3d 178, 180 n. 1 (5th Cir.1994) (no "magic words" required for indemnity provision to cover indemnitee's own negligence).

for the oil company's promise not to acquire leases in a defined "Area of Mutual Interest" for a specific period of time after it has viewed the vendor's prospect. We note that DRI was certainly aware of this last option. Dickinson testified he had used such a forbearance agreement in the past. Moreover, there was such an agreement incorporated in what Dickinson referred to as his "trade sheet" in the prospect package DRI presented to Unocal. Dickinson testified, however, he never mentioned the agreement to Bennett, much less requested him to sign it. He did not know if Bennett ever opened the pamphlet and looked inside. Dickinson testified he did not leave the prospect pamphlet at Unocal, but took it with him when he left.

We conclude the waiver is binding and bars all of DRI's claims. The waiver specifically provided that review of DRI's data did not preclude *any oil and gas operation or activity in any area.* This language is clear. The waiver extinguished DRI's right to sue Unocal as effectively as a prior judgment between the parties. *See Dresser,* 853 S.W.2d at 508. We sustain point of error one.

 We hold the trial court erred in submitting the waiver issue to the jury. As an unambiguous writing, the waiver's construction is for the court. *Westwind Exploration v. Homestate Sav. Ass'n,* 696 S.W.2d 378, 381 (Tex.1985); *Coker,* 650 S.W.2d at 393; *see also Smith v. Holley,* 827 S.W.2d 433, 440 (Tex.App.—San Antonio 1992, writ denied) (unambiguous waiver agreements must be "interpreted according to their wording, not the unwritten subjective intentions of the parties"). It was error to submit the issue to the jury, and we disregard the jury's interpretation of the legal effect of the document. *See Wadsworth Properties v. ITT Employment and Training Systems, Inc.,* 816 S.W.2d 819, 822 (Tex.App.—Houston [1st Dist.] 1991, writ denied). We sustain point of error two.

Because of our disposition of points one and two finding DRI's claims barred, we need not reach DRI's cross appeal contending it is entitled to punitive damages. Likewise, we do not reach DRI's cross point asserting the DTPA as an alternative basis for awarding punitive damages.

 We must address, however, Unocal's point of error fifteen that the trial court erred in denying it recovery of damages for DRI's breach of the waiver agreement as alleged in its counterclaim. Unocal argues its breach of contract claim was established as a matter of law, or alternatively, that the jury's failure to find breach is against the great weight and preponderance of the evidence. The breach question was submitted in question fifteen and after finding no breach, the jury did not reach the damages in question sixteen.

Unocal contends that because of DRI's lawsuit, it abandoned the state leases and lost the $540,000 it had paid. We find the link between breach of the waiver and Unocal's claimed out-of-pocket damages too tenuous. Unocal's contention is that it was forced to abandon the leases; however, it was merely a business decision based upon the risk associated with pending litigation. Unocal admitted it did not want to subject itself to damages in the event it drilled a successful well. It could have pursued the development of the leases despite the litigation or later have abandoned the leases for other reasons. As Unocal argued, there is no obligation to drill an exploratory well on leased land and certainly no guarantee drilling would be successful. *See Sun Exploration & Prod. Co. v. Jackson,* 783 S.W.2d 202, 204 (Tex.1989). The cost of acquiring the leases was a normal business risk undertaken by Unocal and not directly attributable to DRI's filing suit in violation of the waiver in this case. We overrule Unocal's cross point.

In conclusion, we reverse the judgment of the trial court and render judgment that DRI take nothing. TEX.R.APP.P. 81(c).