IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 02-0730
════════════
 
Excess 
Underwriters at Lloyd’s, London and Certain Companies Subscribing 
Severally But Not Jointly to Policy No. 548/TA4011F01, 
Petitioners,
 
v.
 
Frank’s Casing Crew & 
Rental Tools, Inc., Respondent
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Fourteenth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued February 
15, 2006
 
 
            
Justice O’Neill 
delivered the opinion of the Court, joined by Chief Justice Jefferson, Justice Medina, Justice 
Johnson, and Justice 
Willett.
 
            
Justice Hecht 
delivered a dissenting opinion, joined by 
Justice Green.
 
            
Justice Wainwright 
delivered a dissenting opinion.
            
Justice Brister did 
not participate in the decision.
            
On January 6, 2006, we granted respondent’s motion for rehearing. We now 
withdraw our opinion issued May 27, 2005, and substitute the following.
            
In Texas, an insurer that settles a claim against 
its insured when coverage is disputed may seek reimbursement from the insured 
should coverage later be determined not to exist if the insurer “obtains the 
insured’s clear and unequivocal consent to the settlement and the insurer’s 
right to seek reimbursement.” Tex. Ass’n of 
Counties County Gov’t Risk Mgmt. Pool v. Matagorda 
County, 52 S.W.3d 128, 135 (Tex. 2000). In this case, which involves excess 
coverage, the insured consented to the settlement but not to the excess 
insurer’s asserted reimbursement right. We must decide whether to recognize an 
exception to the rule in Matagorda County and imply a reimbursement 
obligation when the policy involves excess coverage, the insurer has no duty to 
defend under the policy, and the insured acknowledges that the claimant’s 
settlement offer is reasonable and demands that the insurer accept it. Because 
none of these distinctions alleviates the concerns that drove the Court’s 
analysis in Matagorda County, we decline to recognize such an exception. 
We further hold that the excess insurers failed to establish that Louisiana law regarding an insurer’s right to 
reimbursement differs from Texas law. Accordingly, we affirm the court of 
appeals’ judgment.
I. Background
            
Frank’s Casing Crew & Rental Tool, Inc. fabricated a drilling 
platform for ARCO/Vastar. When the platform collapsed, 
ARCO sued Frank’s Casing and several others. Frank’s Casing had a $1 million 
primary liability policy, and excess coverage up to $10 million with Excess 
Underwriters at Lloyd’s, London, and Certain Companies Subscribing 
Severally But Not Jointly To Policy No. 548/TA4011F01 
(collectively “excess underwriters”). The excess policy did not require the 
underwriters to assume control of the defense or the settlement of any claims, 
but did give them the right to associate with defense counsel retained by 
Frank’s Casing or the primary insurer if it was reasonably likely that the 
excess coverage layer would be reached. After Frank’s Casing notified the excess 
underwriters of ARCO’s claims, the underwriters issued 
reservation-of-rights letters asserting that coverage for ARCO’s claims was “limited or negated” under the policy’s 
terms.
            
The primary carrier retained defense counsel for Frank’s Casing. As trial 
approached, ARCO offered to settle its claims against Frank’s Casing for $9.9 
million, an amount within the excess policy limits. Frank’s Casing rejected the 
offer without passing it on to the excess underwriters. Two weeks before trial, 
the excess underwriters contacted ARCO directly, without Frank’s Casing’s 
knowledge, and attempted to settle claims the underwriters were willing to 
concede were covered. No agreement was reached. ARCO later made an $8.8 million 
global settlement offer to all of the defendants, about $7.55 million of which 
was allocated to Frank’s Casing. The excess underwriters offered to pay 
two-thirds of this amount if Frank’s Casing and its primary carrier would pay 
the balance, and further agreed to waive all coverage defenses if Frank’s Casing 
accepted that proposal. Alternatively, the excess underwriters offered to pay $5 
million and defer all coverage issues to be resolved in arbitration. Frank’s 
Casing rejected both proposals, insisting that it was covered under the excess 
policy and therefore the underwriters were obligated to fund the entire 
settlement.
            
Shortly before trial, the excess underwriters retained counsel to 
associate with Frank’s Casing and its primary carrier in defending against ARCO’s claims. As trial began, it quickly became clear that 
Frank’s Casing was ARCO’s primary target, prompting 
Frank’s Casing’s in-house counsel to contact ARCO and solicit a settlement 
demand within the excess coverage limits. Frank’s Casing’s counsel suggested 
that something in the $7 million range would be reasonable. ARCO responded with 
a $7.5 million demand. Frank’s Casing forwarded ARCO’s 
demand to the excess underwriters with a letter suggesting that the settlement 
offer was a reasonable one that the underwriters should accept. The letter 
reiterated Frank’s Casing’s disagreement with the underwriters’ coverage 
position, and stated that Frank’s Casing was looking to the underwriters to fund 
the settlement. In their response two days later, the underwriters agreed that 
the case should be settled, but noted that coverage issues remained. The 
underwriters offered to fund the entire settlement if Frank’s Casing would agree 
to reserve those issues for resolution later. Frank’s Casing rejected the 
underwriters’ proposal, contending that the excess insurance policies obligated 
the underwriters to fund the settlement. In response, the excess underwriters 
advised Frank’s Casing that they would pay $7.5 million to settle the claim, 
less any contribution from the primary carrier, and then seek reimbursement from 
Frank’s Casing. Within hours, the underwriters contacted ARCO and orally 
accepted its settlement offer, and the primary carrier tendered its remaining 
policy limits of approximately $500,000. A written settlement agreement among 
ARCO, Frank’s Casing, and the excess underwriters preserved “any claims that 
exist presently” between Frank’s Casing and the underwriters. Before that 
agreement was executed, the excess underwriters filed this suit.
            
Both Frank’s Casing and the excess underwriters filed a series of cross 
motions for partial summary judgment. The trial court initially granted the 
underwriters’ motions on their right to reimbursement. It also granted their 
motions for partial summary judgment on coverage, and another concluding that 
the excess underwriters were entitled to $7,013,612 in damages on their 
reimbursement claim. Before a final judgment was entered, this Court issued 
Texas Association of Counties County Government Risk Management Pool v. 
Matagorda County, declining to recognize an implied-in-fact, an 
implied-in-law, or an equitable reimbursement right outside of the insurance 
policy’s provisions. 52 S.W.3d at 128. In light of our 
decision, the trial court ordered Frank’s Casing to file a motion for new trial 
only on the reimbursement issue. Frank’s Casing filed the motion and the trial 
court granted it, withdrew its prior order, and signed a take-nothing judgment 
in Frank’s Casing’s favor. The court of appeals affirmed. 93 
S.W.3d 178. We granted the excess underwriters’ petition for review to 
decide whether our decision in Matagorda County allows the underwriters 
to assert a reimbursement right under the circumstances presented.
II. Reimbursement Under Texas Law
            
In Matagorda County, we examined an insurer’s 
asserted reimbursement right in similar, though not identical, circumstances. 
52 S.W.3d at 129. There, the Texas Association of 
Counties (TAC) provided law-enforcement liability coverage to Matagorda County, but the policy excluded coverage 
for claims “arising out of jail.” When three inmates who had been assaulted by 
other prisoners in the County’s jail sued the County, TAC initially denied 
coverage based on the jail exclusion. After some negotiation, TAC agreed to pay 
defense costs, subject to a reservation of rights to preserve its coverage 
contest, and filed suit against the County seeking a declaratory judgment that 
the inmates’ claims were not covered. Ultimately, the plaintiffs in the 
underlying suit offered to settle for $300,000, an amount within TAC’s policy limits. Although the County did not dispute the 
reasonableness of the proposed settlement, the County refused to fund or contribute to it, insisting that the claims were covered. At 
this point, TAC issued a second reservation-of-rights letter, again reserving 
its right to continue to deny coverage, but adding a statement that it was not 
waiving “any of its rights to pursue full recovery of this settlement amount 
from the County . . . in the declaratory judgment action.” Id. at 
130. TAC settled the case, then amended its 
pending declaratory judgment action to seek reimbursement.
            
We held that, under the circumstances presented, TAC had not established 
a right to reimbursement. Id. at 
133. First, we held that TAC could only reserve rights that were 
expressed in the policy, and TAC’s policy did not 
contain a right of reimbursement. Id. at 131 (stating “a unilateral reservation-of-rights letter cannot 
create rights not contained in the insurance policy”). Second, we held 
that neither the County’s silence in response to TAC’s 
reservation of rights, nor its failure to contest the settlement’s 
reasonableness, were sufficient to create an implied-in-fact reimbursement 
obligation that did not appear in the policy. Id. at 132–33. Third, we held that TAC had not established a 
right to reimbursement under quasi-contractual theories of quantum meruit or unjust enrichment. Id. at 
134–35. Finally, we held that an insurer could impose a reimbursement 
obligation on its insured by either drafting policies to specifically include a 
reimbursement right, or by obtaining the insured’s “clear and unequivocal 
consent to the settlement and the insurer’s right to seek reimbursement.” 
Id. at 
135.
            
Our analysis in Matagorda County highlighted the dilemma faced 
by both insurer and insured when a claimant presents a settlement demand within 
policy limits and coverage is uncertain. Id. (stating “[w]e recognize that, however the issue is resolved, 
either insurers or insureds will face a difficult 
choice when coverage is questioned”). On one hand, an insurer that 
rejects a reasonable offer within policy limits risks significant potential 
liability for bad-faith insurance practices if it does not ultimately prevail in 
its coverage contest. Id.; see G.A. Stowers Furniture Co. v. Am. Indem. Co., 15 S.W.2d 544, 547 
(Tex. Comm’n App. 1929, holdings approved). 
Denying a reimbursement right in this situation in effect creates coverage in 
those cases where coverage is ultimately determined not to exist. At the same 
time, imposing an extra-contractual reimbursement obligation places the insured 
in a highly untenable position. See Matagorda County, 52 S.W.3d at 
135. The insured is forced “to choose between rejecting a settlement 
within policy limits or accepting a possible financial 
obligation to pay an amount that may be beyond its means, at a time when the 
insured is most vulnerable.” Id. at 
134.
            
We resolved this quandary in Matagorda County, determining that the risk of 
coverage uncertainties was best placed with the insurer. Id. We reasoned 
that “[r]equiring the insurer, rather than the 
insured, to choose a course of action is appropriate because the insurer is in 
the business of analyzing and allocating risk and is in the best position to 
assess the viability of its coverage dispute.” Id. at 135. An insurer in this situation has a number of 
options. If the insurer assesses its coverage position as strong, it may refuse 
to participate in settlement and rely on its coverage action, leaving the 
insured to negotiate a settlement with its own resources. Or, an insurer may 
seek prompt resolution of its coverage dispute, a course we have encouraged 
insurers in this position to take. Id. at 135 (citing State Farm Fire 
& Cas. Co. v. Gandy, 925 S.W.2d 696, 714 
(Tex. 1996); Farmers Tex. County Mut. Ins. Co. v. Griffin, 955 S.W.2d 81, 84 
(Tex. 
1997)). Or, if an insurer’s coverage position is difficult to 
assess, as is sometimes the case, the insurer can leverage the coverage dispute 
during settlement negotiations to lower the claimant’s demand; by paying the 
negotiated claim, the insurer eliminates its own potential bad-faith liability, 
saves defense costs, and avoids protracted coverage litigation with its insured. 
Or, at the outset, the insurer may include a reimbursement right in the policy, 
which may yield a lower premium than a policy that does not contain such a 
right. 
            
By contrast, recognizing an extra-contractual reimbursement right leaves 
insureds with fewer options and creates a number of 
potential problems. As we noted in Matagorda County, allowing an insurer 
to settle claims and then sue its policyholder “foster[s] conflict and distrust 
in the relationship between an insurer and its insured,” a situation that has 
been widely rejected in analogous contexts. Id. at 134; see also Medina v. Herrera, 927 S.W.2d 597, 604 (Tex. 1996). For example, 
courts have long declined to allow insurers to seek equitable subrogation 
against their insureds. See Phonenix Ins. Co. v. Erie & W. Transp. Co., 117 
U.S. 312, 320–25 (1886). 
Strong public policy reasons support that rule:
 
The 
fiduciary relationship between insurer and insured is fraught with conflicting 
interests . . . . [B]ecause of the fiduciary 
relationship, the insurer would be able to secure information from its insured 
under the guise of policy provisions available for later use in a subrogation 
action against the insured. [Further], the right to sue [its] own insured could 
be interpreted by an insurer as judicial sanction to breach the policy of 
insurance.
 
 
Stafford Metal Works, Inc. v. Cook Paint & Varnish Co., 
418 F. Supp. 56, 58–59 (N.D. Tex. 1976) (citations omitted).
            
Several amici further warn that implying 
a reimbursement right would create a significant conflict for defense counsel 
during settlement discussions.[1] According to the amici, if an insured’s acknowledgment of a settlement 
offer’s reasonableness were to expose the insured to an extra-contractual 
reimbursement obligation, as the underwriters here contend it should, defense 
counsel’s traditional role in evaluating and recommending settlement could end 
up advancing the insurer’s interest over that of the insured, necessitating the 
insured’s retention of its own coverage counsel during what may be a critical 
point in the proceedings. Indeed, the amici 
argue, with defense counsel thus hindered from encouraging settlement, both 
the insured and the insurer will likely feel the need to hire their own 
“settlement counsel” to evaluate the case and formulate a strategy for the 
anticipated reimbursement litigation. Whether or not the concerns the amici voice are real or imagined, we believe they do 
portend significant distrust in the insurer/insured relationship during the 
settlement process should an equitable reimbursement right be implied.
            
Several amici also warn that 
recognizing a reimbursement right risks weakening the 
insurer’s incentive to negotiate a settlement most favorable to its insured. 
Knowing that the insured will likely bear the ultimate payment obligation could 
incentivize the insurer to curtail attorney’s fees and litigation expenses early 
in the proceedings by negotiating a quick settlement, with the added benefit of 
extinguishing any risk of Stowers 
liability. See Stowers, 155 S.W.2d at 547. The potentially protracted 
coverage/reimbursement litigation likely to follow would be at the insured’s 
expense, even though the insured purchased insurance for the very purpose of 
hedging the risk and expense of future litigation.
            
The Court in Matagorda County weighed the varying 
risks that arise in this context and decided that insurers, on balance, are 
better positioned to handle them “either by drafting policies to specifically 
provide for reimbursement or by accounting for the possibility that they may 
occasionally pay uncovered claims in their rate structure.” Matagorda 
County, 52 S.W.3d at 136. We decline to overrule that decision, and 
now turn to the underwriters’ argument that the circumstances presented here are 
distinguishable and support their asserted right to reimbursement in this 
case.
III. Excess Underwriters’ Reimbursement Theories
            
The excess underwriters contend that by soliciting the settlement demand 
and agreeing to be bound by it, Frank’s Casing impliedly consented to reimburse 
the excess underwriters. The underwriters further claim an equitable 
reimbursement right under the doctrines of quantum meruit and assumpsit. 
Although we declined to recognize an implied or equitable reimbursement right in 
Matagorda County, the underwriters contend our decision was limited to 
the facts presented in that case. They maintain that the rationale underlying 
our decision does not apply here because the excess underwriters had neither the 
duty to defend nor unilateral control over settlement, factors they contend were 
critical underpinnings of our Matagorda County analysis. The 
underwriters also emphasize that, unlike the insurer in Matagorda 
County, their policy 
prevented them from settling the case without Frank’s Casing’s consent.
A. Implied-in-Fact Agreement
            
The excess underwriters argue that Frank’s Casing impliedly agreed to 
reimbursement by taking an active role in procuring the settlement offer, and in 
demanding that the excess underwriters settle the claim. They also point to 
Frank’s Casing’s participation in the drafting and negotiation of the settlement 
agreement.
            
Undoubtedly, these actions demonstrate that Frank’s Casing believed the 
claims should be settled, but they say nothing about Frank’s Casing’s agreement 
to a reimbursement obligation that does not appear in its policy. To the 
contrary, Frank’s Casing’s letters to the excess underwriters expressed 
continuing disagreement with the insurers’ coverage position, indicated that 
Frank’s Casing was looking to the excess underwriters to fund the entire 
settlement, and made clear that Frank’s Casing would seek recourse against the 
underwriters if the case was not settled and a judgment in excess of policy 
limits resulted. In settling the ARCO suit, both Frank’s Casing and the excess 
carriers expressly sought to preserve their positions in the coverage dispute; 
in effect, they agreed to disagree on the reimbursement question and let the 
trial court decide the legal effect. This is a far cry from impliedly consenting 
to reimbursement. The excess underwriters benefitted from the settlement by 
eliminating potential Stowers liability in the 
event ARCO’s claims were later determined to be 
covered, just as Frank’s Casing benefitted by eliminating the possibility of a 
large verdict that might turn out not to be covered. Given the parties’ explicit 
efforts to preserve their positions, it makes no more sense to say that Frank’s 
Casing impliedly agreed to reimburse the carriers than it would to say that the 
carriers impliedly agreed to waive their coverage position. Just as an insured’s 
acceptance of a defense the insurer proffers with a reservation of rights 
implies the insured’s consent to the reservation, the excess underwriters’ 
agreement to accept the settlement in light of Frank’s Casing’s reimbursement 
contest implied the insurers’ consent to Frank’s Casing’s reservation of the 
reimbursement question. As we reaffirmed in Matagorda County, “a meeting of the minds is an 
essential element of an implied-in-fact contract.” Matagorda County, 52 S.W.3d at 133 (citing Haws & 
Garrett Gen. Contractors, Inc. v. Gorbett Bros. 
Welding Co., 480 S.W.2d 607, 609 (Tex. 1972)). Frank’s Casing’s agreement to 
reimburse the excess insurers cannot be implied in light of its consistent 
position that the insurers alone were responsible for the claims.
            
The excess insurers contend, however, that Frank’s Casing’s agreement may 
be implied here because, unlike in Matagorda County, Frank’s Casing’s 
policy did not allow the insurers to settle without Frank’s Casing’s consent. In 
support, the underwriters cite the following policy language:
 
Liability 
under this policy with respect to any occurrence shall not attach unless and 
until the Assured, or the Assured’s underlying 
insurers, shall have paid the amount of the underlying limits on account of such 
occurrence. The Assured shall make a definite claim for any loss for which 
the Underwriters may be liable under this policy within twelve (12) months after 
the Assured shall have paid an amount of ultimate net loss[2] in excess of the amount borne by the 
Assured or after the Assured’s liability shall have 
been fixed and rendered certain either by final judgment against the Assured 
after actual trial or by written agreement of the Assured, the claimant, and 
Underwriters. If any subsequent payments shall be made by the Assured on 
account of the same occurrence, additional claims shall be made similarly from 
time to time. Such losses shall be due and payable within thirty (30) days after 
they are respectively claimed and proven in conformity with this policy.[3] 
 
 
As we read 
this language, however, it describes when payment is due to the insured under 
the policy. Specifically, the insurer must pay Frank’s Casing when the primary 
coverage layer is exhausted and Frank’s Casing timely presents a claim for any 
excess amount for which it has been found liable as the result of a trial or a 
written agreement to which the parties acquiesced. In other words, the policy 
requires Frank’s Casing to obtain the underwriters’ consent to a settlement to 
receive payment under the policy. The policy language says nothing about the 
underwriters’ reimbursement rights should they decide to negotiate a settlement 
of the claim.
B. Equitable Theories
            
The excess underwriters also claim a reimbursement right under the 
equitable theories of quantum meruit and assumpsit. Under the former theory, one who provides 
valuable services to another may establish that the service’s recipient has an 
implied-in-law obligation to pay when the recipient has reasonable notice that 
the service provider expects to be paid. See Heldenfels Bros., Inc. v. Corpus 
Christi, 832 S.W.2d 39, 41 (Tex. 1992). Under the latter, a cause 
of action arises when money is paid for the use and benefit of another. See King v. Tubb, 551 S.W.2d 436, 
442 (Tex. Civ. App.—Corpus Christi 1977, no writ).
            
We held in Matagorda County that TAC could not recover on 
either quantum meruit or an unjustment enrichment theory, a quasi-contractual doctrine 
that closely resembles assumpsit. The excess 
underwriters argue that Matagorda County does not govern because Frank’s 
Casing sought a settlement demand from ARCO and demanded that the underwriters 
pay it. They also contend that their status as excess insurers with no duty to 
defend distinguishes this case from Matagorda County. Neither of those 
distinctions, however, allays the concerns underlying our analysis in Matagorda 
County.
            
The parties’ respective positions were no less firmly drawn in Matagorda 
County than in this 
case. There, it was clear that “the County was looking to [TAC] to settle . . . 
without a contribution from [the County].” Matagorda, 
52 S.W.3d at 133 (internal quotations omitted). We fail to see how 
Frank’s Casing’s suggestion that ARCO submit a settlement demand within policy 
limits meaningfully distinguishes the decision. In Matagorda County, we 
concluded that “when coverage is disputed and the insurer is presented with a 
reasonable settlement demand within policy limits, the insurer may fund the 
settlement and seek reimbursement only if it obtains the insured’s clear and 
unequivocal consent to the settlement and the insurer’s right to seek 
reimbursement.” Id. at 135 (emphasis added). We did so 
because “[o]therwise, the insured is forced to choose 
between rejecting a settlement within policy limits or 
accepting a possible financial obligation to pay an amount that may be beyond 
its means, at a time when the insured is most vulnerable.” Id. That fundamental concern is unaffected by the fact that the excess 
underwriters had no duty to defend.
            
There is an additional reason that the excess underwriters are not 
entitled to a reimbursement right. That is, “[w]hen a valid agreement already 
addresses the matter, recovery under an equitable 
theory is generally inconsistent with the express agreement.” Fortune Prod. Co. v. Conoco, 
Inc., 52 S.W.3d 671, 684 (Tex. 
2000). Here, the insurance policies spell out the parties’ 
respective obligations in great detail. As set out above, the excess 
underwriters were not liable under the policy until the primary coverage was 
exhausted, Frank’s Casing had provided timely notice, and Frank’s Casing had 
become liable for a judgment either as the result of a trial or a settlement to 
which the excess underwriters had agreed. To recognize an equitable right to 
reimbursement would require us to “rewrite the parties’ contract [or] add to its 
language,” Am. Mfrs. Mut. Ins. 
Co. v. Schaefer, 124 S.W.3d 154, 162 
(Tex. 2003), 
which we decline to do.
C. Other States
            
The excess underwriters also urge us to overrule Matagorda County 
and follow the decisions of the California Supreme Court in Blue Ridge 
Insurance Co. v. Jacobsen, 22 P.3d 313 (Cal. 2001), and a Florida appellate 
court in Colony Insurance Co. v. G & E Tires & Service, Inc., 777 
So. 2d 1034 (
Fla. Dist. Ct. 
App. 2000). In Blue 
Ridge, the California Supreme Court implied a reimbursement 
obligation in favor of a liability insurer that funded a settlement of claims 
ultimately determined not to be covered. Blue 
Ridge, 22 P.3d at 314. The California court distinguished our decision in 
Matagorda County on the basis that California provides a much more limited opportunity to 
resolve coverage issues before the underlying lawsuit is resolved than does 
Texas. 
Id. at 
322–23. Moreover, the legal background underlying Blue Ridge 
differs significantly from Texas law. An insurer in Texas cannot be held 
liable under Stowers for failing to settle a 
claim that is not covered. Am. Physicians Ins. Exch. v. 
Garcia, 876 S.W.2d 842, 849 (Tex. 1994). Under California law, however, 
an insurer may not consider whether claims are covered in evaluating settlement 
demands. Blue Ridge, 22 P.2d at 318.
            
In Colony Insurance, the Florida appeals court held that a liability 
insurer’s reservation of rights letter, coupled with the insured’s acceptance of 
a defense, entitled the insurer to reimbursement for defense costs it had paid. 
777 So. 2d at 1039. We held in Matagorda 
County, however, that a 
unilateral reservation-of-rights letter could not create a reimbursement 
obligation not contained in the insurance contract. Matagorda 
County, 52 S.W.3d at 131. As we have noted, to follow Colony 
Insurance would require us to overrule Matagorda County, which we decline to 
do.
IV. The Dissents
            
Justice Hecht would impose an equitable reimbursement obligation on 
Frank’s Casing that is not found in its policy, supplementing the terms these 
sophisticated parties negotiated based on an unjust-enrichment theory. Justice 
Wainwright, recognizing that the equities presented cut both ways, does not 
agree that a reimbursement right may be implied in law; instead, he would apply 
one in fact, as a matter of law, based on Frank’s Casing’s acquiescence in the 
settlement, even though both parties expressly reserved their respective 
positions on the coverage/reimbursement question. On indistinguishable facts, we 
rejected both of those theories in Matagorda County. 52 S.W.3d at 
131–35. In “rewrit[ing] the parties’ contract . . . [because they] believe we 
should,” Utica Nat’l Ins. Co. of Tex. v. Am. Indem. 
Co., 141 S.W.3d 198, 208 (Tex. 2004) (Hecht, J., dissenting), and eschewing 
our own precedent, the dissenting justices would, in the words of one amicus 
curiae, “take[] a step back from predictability in the law related to 
business transactions in Texas and, therefore, a step back from the continuing 
effort to attain a fair, efficient, and predictable civil justice system,” 
Amicus Curiae Brief of Texas Civil Justice League in Support of Respondent’s 
Motion for Rehearing, at 2.
            
In Matagorda County, this Court drew a bright-line 
rule disallowing reimbursement on an equitable unjust-enrichment theory because 
insurers are in a superior position to evaluate the risks stemming from a 
coverage dispute and can expressly allocate that risk by delineating 
reimbursement rights in their policies. 52 S.W.3d at 
135–36. Justice Hecht’s approach would undermine both the predictability 
that our decision in Matagorda County provided and the “strong public 
policy in favor of preserving the freedom of contract.” Fortis Benefits v. 
Cantu, 234 S.W.3d 642, 649 (Tex. 2007). Just a few months ago, we 
concluded that an insured could not rely on the equitable “made-whole” doctrine 
to supplant a contractual subrogation clause. Id. at 645. We warned that courts “should not by judicial fiat 
insert non-existent language . . . into parties’ agreed-to contracts . . . .” 
Id. 
at 649 n.41. The Court proclaimed itself “loathe to 
judicially rewrite the parties’ contract by engrafting extra-contractual 
standards,” id. at 649, and reaffirmed the 
reasoning that supported our holding in Matagorda County: “insurers are well equipped to 
evaluate and reduce risk by, for example, ‘drafting policies to specifically 
provide for reimbursement,’” id. (quoting 
Matagorda County, 52 S.W.3d at 136).
            
Justice Hecht attempts to limit our decision in Matagorda 
County to its 
facts, arguing the concerns that drove our decision there do not exist in this 
case and, even if they did, an equitable remedy could be fashioned to do equity 
in accordance with general restitution principles. While his dissent asserts 
that the remedy could be limited to avoid “unfairness,” it offers little 
guidance as to the remedy’s boundaries. He hints that the concerns underlying 
Matagorda County do not apply because Frank’s Casing is “a substantial 
business.” Under Justice Hecht’s construct, then, whether an insured faces a 
reimbursement obligation would have to be decided on a case-by-case basis: insureds with less economic heft than Frank’s Casing but 
more than Matagorda County might or might not be on the hook, 
depending upon how a court might view the “equities” presented. Justice Hecht’s 
approach would breed uncertainty and “promote litigation rather than settle it.” 
Gandy, 925 S.W.2d at 709.
            
Justice Wainwright’s approach is similarly untenable. Agreeing with the 
Court that the circumstances would not support a reimbursement right implied in 
law, he would imply one in fact — as a matter of law. As in Matagorda 
County, however, the record here affirmatively demonstrates just the 
opposite. Frank’s Casing’s repeated insistence on its coverage position and on 
the excess underwriters’ obligation to fund any settlement, and its express 
reservation of the question, belie any meeting of the minds — “an essential 
element of an implied-in-fact contract.” Matagorda County, 52 S.W.3d at 
133. Just as in Matagorda County, Frank’s Casing “consistently 
contested [the excess underwriters’] coverage position and insisted that [they] 
pay under the policy.” Id. Undoubtedly, the parties agreed 
that the case should be settled. But the excess underwriters’ own letter to 
Frank’s Casing advising that it would contact ARCO and attempt to settle noted 
that the underwriters had “asked Frank’s to contribute to the settlement [and] 
Frank’s ha[d] refused.” Furthermore, though Justice Wainwright contends that 
Frank’s Casing’s agreement to the settlement constituted a manifestation of 
assent to the terms on which it was offered, there is uncontested evidence that 
the excess underwriters first mentioned reimbursement in a letter it sent to 
Frank’s Casing just hours before they contacted the plaintiffs and settled the 
case. Frank’s Casing’s assent cannot be inferred under these circumstances. 
See Restatement (Second) of 
Contracts § 69(1)(a) (1981) (noting that assent 
may only be inferred “[w]here an offeree takes the 
benefit of offered services with reasonable opportunity to reject them”). We 
held on nearly identical facts in Matagorda County that “there was no 
meeting of the minds” between the insurer and its insureds. Id. Given the parties’ explicit efforts 
to preserve their respective positions on the coverage/reimbursement question, 
it makes no more sense to conclude that Frank’s Casing impliedly agreed to 
reimburse the excess carriers than it would to say that the excess carriers 
impliedly agreed to waive their coverage position.
V. Choice of Law
            
The excess underwriters argue alternatively that Louisiana law recognizes 
a reimbursement right, and that state’s law should apply to this case because 
Frank’s Casing’s principal place of business is in Louisiana, the policy was 
issued through a Louisiana insurance agency, and the underlying incident arose 
from work Frank’s Casing performed in Louisiana. Frank’s Casing contends that 
the excess underwriters never requested that the trial court apply Louisiana law to the reimbursement issue, and also never 
established that it differs from Texas law. We agree with Frank’s Casing.
            
The excess underwriters never requested that the trial court apply 
Louisiana law to the reimbursement issue or 
clearly asserted that Louisiana law applies. Instead, a footnote in 
their motion for summary judgment simply alluded to Louisiana law “[t]o the extent [it] might apply to this 
case,” and then cited two Louisiana statutes, Louisiana Civil Code 
articles 2055 and 2298, and two cases, Edmonston v. A-Second Mortgage Co., 289 So. 
2d 116 (La. 1974), and 
E.F. Minyard v. Curtis Products, Inc., 205 
So.2d 422 (La. 
1967), generally allowing recovery for unjust enrichment. Neither the 
statutes nor the cases cited specifically addressed an insurer’s right to 
reimbursement from its insured when it settles a claim that is ultimately 
determined not to be covered, absent an express agreement.[4] In addition, after this Court issued its 
decision in Matagorda 
County, the excess underwriters 
again briefly cited general Louisiana unjust-enrichment law in their 
response to Frank’s Casing’s motion for reconsideration of the trial court’s 
partial summary judgment on reimbursement. After arguing at length that 
Matagorda County did not govern reimbursement in this case, they added a 
final three-paragraph section entitled “Louisiana Law Governs Excess 
Underwriters’ Right to Reimbursement.” They still did not ask the trial court to 
apply Louisiana law, however, but instead 
merely argued that Louisiana law would allow 
reimbursement “[t]o the extent this Court finds Louisiana law controlling.” Even if the excess 
underwriters had clearly requested the court to apply Louisiana law, we cannot tell from the authorities they 
have cited how a Louisiana court would resolve the issue before 
us. As the party advocating the application of Louisiana law, the excess underwriters bore the burden of 
establishing that it differed from Texas law to 
overcome the presumption that it is the same as Texas’s. See Gevinson v. Manhattan Constr. Co. of Ok., 449 S.W.2d 
458, 465 n.2 (Tex. 1969); see also Unocal Corp. v. Dickinson Res. Inc., 
889 S.W.2d 604, 607 n.2 (Tex. App.—Houston [14th Dist.] 1994), writ denied 
per curiam, 907 S.W.2d 453 (Tex. 1995).[5] Because they have not, we presume that 
the outcome would be no different under the foreign state’s law.
VI. Conclusion
            
We hold that the excess underwriters have not established a right to 
reimbursement under Texas law, nor have they 
established that the application of Louisiana law would produce a different 
result. Accordingly, we affirm the court of appeals’ judgment.
 
                                                                        
___________________________________
                                                                        
Harriet O’Neill
                                                                        
Justice
 
OPINION DELIVERED: 
February 1, 2008








[1] 
We received amicus curiae briefs from United Policyholders; Pilco, Inc.; Shell Oil Co., Motiva Enterprises LLC, 
Burlington Resources Inc., Temple-Inland Inc., and Brad Fish, Inc.; the Texas 
Association of Defense Counsel; the Texas Civil Justice League; and Fred A. 
Simpson and Randall L. Smith, opposing a right to reimbursement under these 
circumstances. These amici argue generally that 
allowing reimbursement would distort the process of settling third-party 
liability claims and would allow insurers to extract contributions from their 
insureds that their policies do not support. The 
Complex Insurance Claims Litigation Association and the Property Casualty 
Insurers Association of America submitted briefs supporting the underwriters’ 
right to reimbursement.

[2] 
The policy defines “ultimate net loss” as “the total sum which the Assured, or 
his Underlying Insurers as scheduled, or both, become obligated to pay . . . 
either through adjudication or compromise . . . . ”

[3] 
The title of this clause is not clear on any portion of the record; Frank’s 
Casing refers to it as a “Loss Payable” clause, a characterization that the 
excess underwriters do not dispute.

[4] 
In Edmonston, for example, the court held that 
a widow who had unwittingly conveyed a home worth more than $24,000 to a 
mortgage company to satisfy a $5,178.24 second mortgage could recover under 
Louisiana’s unjust- enrichment statutes. 289 So.2d at 
122. In Minyard, the court considered 
when limitations had run on a subcontractor’s claim to recover from a product supplier amounts it had paid to compensate the 
contractor for defective caulking. 205 So. 2d at 638. 
The court merely equated the subcontractor’s claim seeking indemnity with an 
unjust-enrichment claim in determining the appropriate limitations period. 
Id. at 650, 
653. In response to Frank’s Casing’s motion for reconsideration of the 
trial court’s partial summary judgment on reimbursement, the excess underwriters 
cited a suit in which a court held that an insurer was not liable for statutory 
bad-faith penalties because the insurer had sought reimbursement of settlement 
costs. Peavey Co. v. M/V ANPA, 971 F.2d 1168 (5th Cir. 
1992). In reversing the penalties, the Fifth Circuit noted that the the insured had stipulated that it would be liable to 
reimburse the insurer if coverage was resolved in the insurer’s favor. 
Id. at 
1177.

[5] 
The excess underwriters contend that the presumption that another state’s law is 
the same as this state’s does not apply because Louisiana law is not based on the common law, 
citing 29 Am. Jur. 2d Evidence § 259 (2002). Neither we nor any other 
Texas court 
has recognized this distinction. In fact, we recently indicated that the 
presumption would normally apply in a case involving Louisiana law. Coca-Cola Co. v. Harmar Bottling 
Co., 218 S.W.3d 671, 685 (Tex. 
2006).