Joyce Ann **WINKLER**, et al., Appellants,

v.

**KIRKWOOD ATRIUM OFFICE PARK**, et al., Appellees.

No. A14–90–016–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 1, 1991.

Rehearing Overruled Sept. 19, 1991.

John Roberson, Ronald G. Franklin, Houston, for appellants.

James M. Kimbell, Carla Bennett, Houston, for appellees.

Before J. CURTISS BROWN, C.J., and MURPHY and JUNELL, JJ.

## OPINION ON MOTIONS FOR REHEARING

JUNELL, Justice.

On motions for rehearing, we withdraw our opinion of April 4, 1991 and substitute the following therefor.

The widow and children of John F. Winkler appeal from a summary judgment adversely disposing of their wrongful death and survival claims against the various individuals and entities involved in the operation of a fitness center where Winkler suffered a fatal heart attack following an exercise workout. Described as an obese smoker and heavy drinker, age 45, Winkler joined the fitness center at the advice of his doctor to exercise and lose weight. Appellants allege that appellees' negligence in not providing Winkler a personalized "exer-

cise prescription," as promised, and in failing to supervise or instruct him, caused or contributed to his death. The fitness center obtained its summary judgment on the sole basis of a membership agreement which Winkler signed discharging claims against the club for injuries suffered while participating in the center's programs. The other defendants contend they also were covered by the agreement. In addition, the club's fitness expert, Samuel R. Shalala, argued that he could not be negligent in the "development" of Winkler's personalized fitness program because he never designed a program for Winkler. The trial court ruled as a matter of law that appellants failed to raise a fact issue to support their claim that the release was fraudulently induced. We affirm.

■ Winkler signed the membership agreement when he joined the Executive Fitness Center as an "executive member" on January 15, 1985. On page three, under the heading "Medical Release," the agreement states:

In consideration of the Buyer's acceptance as a member of the Club, the Buyer does hereby for his [sic] or herself, heirs, executors, legatgees [sic], administrators, or assigns, waive, release and forever discharge any and all claims the Buyer may now or in the future have against the Club for injuries suffered by the Buyer while participating in any programs of the Club. Buyer's signature below evidences this understanding and agreement.

Appellants contend, however, the release may be set aside because Winkler was fraudulently induced into signing after relying on misrepresentations made in the center's marketing brochure. In the brochure distributed to potential members, Executive Fitness Center, Inc. represented that its "staff of fitness experts" would provide individual guidance in exercise and nutrition, and it promised each member an "exercise prescription" that would improve his heart and lung performance. In the brochure, former Houston Oiler Mac Haik stated, "We will conduct a full spectrum of physiological measurements on each mem-

ber including vital signs, pulmonary function, muscle/fat ratio, oxygen uptake capacity. These and other clinical data will be computer analyzed so the clinician can prepare each individual's specific exercise prescription." Directing the facility would be appellee Samuel R. Shalala, whom the brochure described as "one of the nation's foremost fitness experts." Appellants contend the literature misrepresented Shalala as a medical doctor. Under the heading, "A Visit with Dr. Sam," Shalala discussed health and fitness issues, referring to himself as "Doc." He was pictured several times in the brochure wearing the long white overcoat of a physician, and in one photograph he was shown using a stethoscope in the "computerized human performance clinic." Appellants contend that the representations made in the brochure persuaded Winkler to join the facility. Regarding the impression that Shalala was a medical doctor, however, the membership agreement Winkler signed specifically noted that "the Club's staff are not licensed physicians." Further, there is no evidence that Winkler saw the brochures and relied upon them. *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977) (reliance an element of fraud in the inducement); *Schmaltz v. Walder*, 566 S.W.2d 81, 85 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.) Because fraud in the inducement is in the nature of an affirmative defense, the burden was on appellants to support their claim with proof in order to raise a fact issue in response to a motion for summary judgment. *See Nichols v. Smith*, 507 S.W.2d 518, 520 (Tex.1974); *C.S.R., Inc. v. Mobile Crane, Inc.*, 671 S.W.2d 638, 643 (Tex.App.—Corpus Christi 1984, no writ). Appellants failed to raise a genuine issue of material fact that the release was fraudulently induced.

■ Next, appellants contend the Mac Haik defendants cannot avail themselves of the protection of the release because they were not specifically identified as parties to the release. *McMillen v. Klingensmith*, 467 S.W.2d 193, 196 (Tex.1971). However, a tortfeasor can claim the protection of a release if he is referred to with such descriptive particularity that his connection

with the tortious event is not in doubt. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420 (Tex.1984). Here, the summary judgment evidence is undisputed that the Mac Haik defendants "participate[d] in the design, planning, construction, staffing or supervision" of the club, and were involved in "the inspection of the procedures or practices of the premises staff." In releasing "the Club" from any injuries suffered while participating in the center's programs, it is clear that Winkler intended to release any claim against all individuals and entities involved in the operation, maintenance, and administration of the center.

Finally, appellants contend the trial court erred in granting summary judgment for Shalala on the basis of his claim there is no evidence to support appellants' allegation that he was negligent in the development of an exercise plan for Winkler. As director of the facility, Shalala was responsible for physiological testing of the club's executive members. In the affidavit Shalala submitted in support of summary judgment, he presented the following account of his only meeting with Winkler, occurring on the day that Winkler joined the club:

After signing on as a member, Winkler walked into Shalala's office and asked if he was the person Winkler was supposed to see about "getting started." Winkler explained that he joined the club "because his doctor told him to lose weight and get some exercise." He added that he smoked "four or five" packs of cigarettes each day, and on some days he drank as much as a quart of hard liquor. Shalala attempted to measure Winkler's body fat but even by opening his calipers to their maximum width, "it was impossible to caliper his total subcutaneous fat because there was simply too much of it." Shalala could only determine that Winkler's percentage of body fat ranged from 30 to 50 percent. Next, Shalala administered two tests measuring lung capacity. During the first one, Winkler became "flushed in the face" and stopped blowing before Shalala could get a reliable reading. In the second test, Winkler became dizzy from trying to blow out a candle. Attempting to get a blood pressure reading, Shalala found the cuff too small to

encircle Winkler's arm. After Winkler had difficulty maintaining 50 revolutions per minute on a bicycle ergometer, Shalala aborted the test and told Winkler he was "in horrible shape." He then suggested that Winkler return to his doctor for a specific exercise program, and advised him there was a diagnostic center in the next building where he could get a complete physical examination and help with his drinking, smoking, and eating habits.

Shalala added that after this meeting, which lasted approximately 45 minutes, he never saw Winkler again in the gym.

■ Appellants contend that in a summary judgment proceeding, the testimony of an interested witness, such as Shalala, does no more than create a fact issue as to his credibility. *Goodman v. Gallerano*, 695 S.W.2d 286, 288 (Tex.App.—Dallas 1985, no writ). However, an exception to the general rule exists if the uncontroverted testimony of an interested witness is (1) clear, positive, and direct; (2) otherwise credible; (3) free from contradictions and inconsistencies; and (4) could have been readily controverted. A summary judgment may be based on the uncontroverted testimony of an interested witness when all four of these conditions are met. Tex. R.Civ.P. 166a(c). Shalala's affidavit, however, does not fit within the recognized exception because it fails to meet the fourth prong. Although detailed and potentially persuasive, Shalala's testimony could not have been readily controverted since Winkler, the only other party present at the meeting described, is deceased. Consequently, the affidavit does not establish the facts conclusively. Rather, it raises an issue of fact regarding the question of negligence, and therefore cannot support the summary judgment on which it is based. When, as here, the credibility of an affiant is likely to be a dispositive factor in the resolution of the case, summary judgment is inappropriate. *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex.1989). However, we hold that Shalala's summary judgment was proper because, by releasing "the Club," Winkler waived any claims of negligence against its director. Although ada-

mantly contending that he was not negligent because, in fact, he refused to design an exercise program for Winkler, Shalala attached the membership agreement release to his motion for summary judgment. He specifically pointed the trial court's attention to the following exculpatory language in the release: "The Buyer agrees that he or she is not relying in any way upon the results of the physiological measurements of the Club's staff in the Buyer's decision to begin exercising at the Club[.]" On the basis of the release, we hold that the trial court did not err in granting summary judgment for Shalala.

A release executed by a decedent precludes his beneficiaries from bringing suit under Texas wrongful death and survival statutes. *Thompson v. Fort Worth & Rio Grande Railway Co.,* 97 Tex. 590, 80 S.W. 990 (1904); *McClellan v. Boehmer,* 700 S.W.2d 687, 690 (Tex.App.—Corpus Christi 1985, no writ). Therefore, we hold that the membership agreement release supports summary judgment for each appellee.

We affirm the judgment of the trial court.