TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-11-00700-CV






Revel Thom, Appellant


v.


Rebel's Honky Tonk; Rainbow Cattle Company, Inc., and Zack Truesdell, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT

NO. D-1-GN-10-001074, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING






M E M O R A N D U M O P I N I O N

 

 Revel Thom appeals from a final summary judgment in favor of Rebel's Honky Tonk,
Rainbow Cattle Company, Inc., and Zack Truesdell (collectively, "Rebel's") on Thom's claims
for negligence, premises liability, negligence per se, and negligent hiring. Thom argues that the
district court erred by granting the motion for summary judgment because appellees failed to
conclusively establish their defenses of release and assumed risk and because he raised genuine
issues of material fact on two of his claims. We will affirm the district court's judgment.


 BACKGROUND

 Thom's claims arise from a visit to Rebel's Honky Tonk, a downtown Austin bar
owned by Rainbow Cattle Co., Inc. While there, Thom decided to ride a mechanical bull that
was owned and operated by Rebel's. Before riding the mechanical bull, Thom completed and signed
a release document provided to him by Rebel's entitled "PARTICIPANT AGREEMENT,
RELEASE AND ASSUMPTION OF RISK" (Release). This release document purported to have
Thom acknowledge the risks of riding the mechanical bull, disclose any pre-existing health issues,
and release and indemnify Rebel's and related parties.

 Although Thom suffered from chronic back pain for four to five years requiring him
to receive annual epidurals to numb the pain, he nevertheless said nothing about his back condition
to the mechanical bull operator. Thom rode the mechanical bull until he was thrown off, resulting
in the fracture of the T-12 and L-1 vertebrae in his back. Thom then sued Rebel's for his injuries.

 Rebel's moved for a traditional summary judgment, arguing that they conclusively
established the affirmative defenses of release and assumption of the risk. Rebel's also sought a no-evidence summary judgment on Thom's claims of negligence and negligent supervision. Thom
objected to the appellees' summary-judgment evidence and responded with his own evidence,
including: affidavits from Thom and his private investigator Dana James-Johnson, medical drawings
of Thom's broken vertebrae, and excerpts from the depositions of bar manager Chris Hale and
Rainbow Cattle Company president Zack Truesdell. Rebel's filed objections to the affidavits and
the medical drawings that Thom produced. The district court signed an order sustaining Rebel's
objections to James-Johnson's affidavit, the medical drawings, and certain statements in Thom's
affidavit, then granting Rebel's motion for summary judgment without stating the basis for its ruling.
This appeal followed.


 ANALYSIS


Standard of review

 The party moving for summary judgment has the burden of showing that there is no
genuine issue of material fact and that it is entitled to judgment as a matter of law. Rhone-Poulenc,
Inc. v. Steel, 997 S.W.2d 217, 222 (Tex. 1999); see Tex. R. Civ. P. 166a(c). We review the
district court's summary judgment ruling de novo. Zurich American Ins. Co. v. McVey, 339 S.W.3d
724, 727 (Tex. App.--Austin 2011, pet. denied). In deciding whether there is a disputed material
fact issue precluding summary judgment, we take evidence favorable to the non-movant as true,
indulge every reasonable inference in favor of the non-movant, and resolve any doubts in its favor.
Rhone-Poulenc, Inc., 997 S.W.2d at 223; see Tex. R. Civ. P. 166a(c).

 Because the trial court's order does not specify the grounds for its summary judgment,
we must affirm the summary judgment if any of the theories presented to the trial court are
meritorious. Provident Life and Acc. Ins. Co. v. Knott, 128 S.W.3d 211, 216 (Tex. 2003). Typically,
when both traditional and no-evidence motions for summary judgment are filed, we address the no-evidence motion first. See Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 600 (Tex. 2004). 
However, in this case we need only address the trial court's ruling in the context of the affirmative
defenses of release and assumption of risk in the traditional summary-judgment motion because it is
dispositive. See Poag v. Flories, 317 S.W.3d 820, 825 (Tex. App.--Fort Worth 2010, pet. denied);
see also Tex. R. App. P. 47.1 (requiring "written opinion that is as brief as practicable," addressing
all issues that are raised and necessary to final disposition).


Rebel's affirmative defense of release

 When a defendant moves for summary judgment based on an affirmative defense,
the defendant must conclusively establish each essential element of the affirmative defense.
Ryland Grp., Inc. v. Hood, 924 S.W.2d 120, 121 (Tex. 1996) (per curiam); see Tex. R. Civ.
P. 166a(c). When the summary-judgment movant relies on the affirmative defense of release, the
movant must conclusively establish the "fair notice" requirements of conspicuousness and the
express negligence rule. See Dresser Indus., Inc. v. Page Petroleum, Inc., 853 S.W.2d 505, 509
(Tex. 1993).

 Thom argues that the district court erred in granting Rebel's summary-judgment
motion because Rebel's failed to establish all of the essential elements of its release defense.
Specifically, Thom argues that: (1) the Release was inconspicuous; (2) actual knowledge cannot
replace the requirement of conspicuousness; and (3) the Release did not identify all defendants. 


 (1) Conspicuousness of release language

 Based on the theory that a pre-injury release of a party's own negligence is an
extraordinary shifting of risk, the Texas Supreme Court has developed fair notice requirements to
be applied to release agreements. Id. at 508. To constitute fair notice, a release must satisfy
the elements of conspicuousness and the express-negligence rule, which mandates that the intent
of the parties seeking to indemnify themselves for their own negligence be specifically stated
in the four corners of the contract. See Storage & Processors, Inc. v. Reyes, 134 S.W.3d 190,
192 (Tex. 2004). Thom argues only that Rebel's did not meet the "conspicuousness" element of
fair notice. Specifically, Thom argues that the Release does not conform to the definition of
"conspicuous" as codified in the Texas Business and Commerce Code because the Release does not
contain contrasting type or color. (1)

 Thom relies primarily on the Texas Supreme Court's Littlefield opinion, which
rejected a release consisting of six paragraphs with thirty lines of text in "minuscule" type
compressed into a 3" x 4.25" square in the lower-left-hand corner of a registration form. Littlefield
v. Schaefer, 955 S.W.2d 272, 274 (Tex. 1997). The heading of the Littlefield release was printed in
four-point font and contained 28 characters per inch. Id. The main text was printed in even smaller
typeface and contained 38 characters per inch. Id. The text of the Littlefield release, described by
the Court as "illegible," "too small," and "containing minuscule print," ultimately led the Court to
conclude that the release was not conspicuous. Id. at 275 ("Where a party is not able to know
what the contract terms are because they are unreadable, as a matter of law the exculpatory clause
will not be enforced.").

 Contrary to Thom's assertions, the release at issue here does not suffer from the
failings described in Littlefield. Unlike the Littlefield release, the Release here is not embedded in
a form intended for other purposes, but rather Rebel's entire form is a release and assumption of risk.
Beginning with its capitalized title, down to Thom's undisputed signature, the Release is wholly
dedicated to warning mechanical bull riding participants of the dangers, instructing participants on
the necessary precautions, and informing participants of the rights they are waiving.

 The Release's title leaves little doubt as to the document's purpose:
"PARTICIPANT AGREEMENT, RELEASE AND ASSUMPTION OF RISK." The paragraph
numbered "3" on Rebel's release clearly and legibly states, "I he[re]by voluntarily release . . . agree
to indemnify and hold harmless from any and all claims . . . which allege negligent acts or
omissions." (Emphasis added.) The Release's text only contains 18 characters per inch, making it
much easier to read than Littlefield's text. It also contains bolded and underlined warnings that
certain participants are not allowed to ride, and participants must inform the mechanical bull operator
about pre-existing health conditions so that the operator may determine whether the participant will
be allowed to ride. Consistent with the supreme court's declaration that the "releasing party must
be able to read what is being released," Littlefield, 955 S.W.2d at 275, the release that Thom signed
makes its intent clear by taking up an entire letter-sized page, using a reasonable font size, and not
surrounding the release language with text unrelated to riding the mechanical bull. See Quintana
v. CrossFit Dallas, L.L.C., 347 S.W.3d 445, 451 (Tex. App.--Dallas 2011, no pet.) (concluding that
two-page release, with "release" printed in bold near top of second page and in larger type than other
text on that page was conspicuous); see also Gaspard v. Logix Commc'ns Corp., No. 14-00-00688-CV, 2001 WL 1590080, at *2 (Tex. App.--Houston [14th Dist.] Dec. 13, 2001, no pet.) (mem. op.,
not designated for publication) (concluding that release printed on its own page and in standard
typeface was conspicuous).

 The test of conspicuousness is "whether attention can reasonably be expected to be
called to it." Quintana, 347 S.W.3d at 450 (quoting Littlefield, 955 S.W.2d at 275). "A release is
conspicuous when a reasonable person against whom a clause is to operate ought to have noticed it."
Dresser Indus. Inc., 853 S.W.2d at 511; see Quintana, 347 S.W.3d at 451. Although business and
commerce code section 1.201(10) contains two subsections describing what "conspicuous terms
include," the statute does not require that a release satisfy both subsections. See Tex. Bus. & Com.
Code Ann. § 1.201(10) (West 2009); see also Quintana, 347 S.W.3d at 450. Rather, subsections (A)
and (B) are merely two possible ways of making a release conspicuous. It is also possible that other
factors not listed in subsections (A) or (B) may create a conspicuous release. See Tex. Gov't Code
Ann. § 311.005(13) (West 2005) ("'Includes' and 'including' are terms of enlargement and not of
limitation or exclusive enumeration, and use of the terms does not create a presumption that
components not expressed are excluded.").

 Thus, based on the foregoing authority, we conclude that the undisputed
summary judgment evidence shows that this release satisfies the conspicuousness element (the only
challenged element here) of fair-notice and thus satisfies all of the fair-notice requirements.


 (2) Actual knowledge of the release

 Even an inconspicuous release can be valid when the party resisting its application
had actual knowledge of the release. The burden of proving "actual knowledge" is on Rebel's, as
the party seeking release. See Garcia v. J.J.S. Enters., Inc., 225 S.W.3d 57, 64 (Tex. App.--El Paso
2005, no pet.). Even if we concluded that the release failed the test of conspicuousness, the
record shows conclusively that Thom had actual knowledge of the nature of the release. An
agreement can be enforced--even if the fair-notice requirements concerning the express-negligence
rule or conspicuousness were not satisfied--if both parties have actual knowledge of the agreement's
terms. See Storage & Processors, Inc., 134 S.W.3d at 192; Missouri Pac. R.R. Co. v. Lely Dev.
Corp., 86 S.W.3d 787, 791 (Tex. App.--Austin 2002, pet. dism'd).

 The record reflects that during his oral deposition, Thom was asked if he knew what
he was signing when he completed the Release before riding the mechanical bull on the night of his
injury. Despite claiming he had not read the Release, Thom testified that he knew he was signing
a "waiver" for possible injuries:


 Q: Did you formulate any idea in your head about what kind of piece of paper this
might be, what they might want you to sign?


A: A waiver.


Q: Was that your understanding at the time?


A. Well, that was the waiver that it said on the wall.


Q: Right.


 A: So I put two and two together, and--but as I said, it happened pretty quick, and
I didn't really get a chance to read it.

 

Q: What did you mean when you said waiver?


. . . . [Objection omitted]


A: A piece of paper to sign.


Q: For what purposes?


. . . . [Objection omitted]


A: I mean--I guess for some type of injury.


Q: That was your understanding at the time, correct?


A: Yeah. But once again, I should have read it.



 Thom denied that the release was difficult to understand or confusing:



 Q: If you had read the document at the time, you would have understood what it
meant, correct?


A: Yes.



Thom acknowledged his comprehension of the meaning of every paragraph. He claimed he felt
rushed into signing the release, but there is nothing in the record to indicate that he was hurried,
intimidated, or forced to sign the release without reading it. And Thom further agreed in his
deposition that there was nothing to stop him from saying, "Hold on a second. I need to read this."

 Thom understood the effect of signing Rebel's release, and as such Thom had actual
knowledge of the agreement, making the release enforceable even if the fair-notice elements were
lacking. Missouri Pac. R.R. Co., 86 S.W.3d at 791 (applying fair-notice requirements to indemnity
agreement). Even if Thom chose not to read the release, the record reflects his understanding that
what he signed was a waiver for possible injury, proving that this release served its principal function
and that Thom had actual knowledge of it.

 As such, the release satisfies the conspicuousness requirements and, even if it did not,
Rebel's met its burden of proving Thom's actual knowledge, and thus the trial court correctly found
that Thom is bound by the release's terms.


 (3) Release effective as to all defendants

Thom also argues that Rainbow Cattle Company, Inc. and Zack Truesdell, President
of Rainbow Cattle Company, Inc., are not named parties protected by the release, thus the affirmative
defense of release is not available to them. We disagree.

A release form is only effective against the parties that are named in the release or are
described in the release with such particularity that the party's identity is not in doubt. Memorial
Med. Ctr. of E. Tex. v. Keszler, 943 S.W.2d 433, 434 (Tex. 1997) (per curiam) (citing Duncan
v. Cessna Aircraft Co., 665 S.W.2d 414, 420 (Tex. 1984)). Interpretation of a release is to be
decided by the court as a question of law. Memorial Med. Ctr. of E. Tex., 943 S.W.2d at 434;
Westwind Exploration v. Homestate Sav. Ass'n, 696 S.W.2d 378, 381 (Tex. 1985).

Thom claims that Duncan v. Cessna Aircraft Co. supports his argument that the
release does not extend to Rainbow Cattle Company and Zack Truesdell. See Duncan, 665 S.W.2d
at 420. Duncan involved a wrongful death action in which Carolyn Duncan's husband was killed
as a result of a negligently flown Cessna 150 airplane that crashed in New Mexico. Duncan,
665 S.W.2d at 418. Duncan first sued the pilot and the airplane owner. Id. That case was settled
and a release was executed. Id. The Duncan release stated, "we hereby release Air Plains West, Inc.,
. . . the Estate of Benjamin A. Smithson, Jr., deceased, or any other corporations or persons
whomsoever responsible therefor, whether named herein or not, from any and all claims of
every kind." Id. (emphasis added). Duncan then instituted a wrongful death action against Cessna.
Id. Cessna claimed that its liability to the Duncan family was discharged by the Duncan release
of Air Plains West. Id. The court ultimately held that Cessna was not protected by the Duncan
release because the reference to "all corporations" did not supply the descriptive particularity
necessary to identify and release Cessna. Id. at 420. The court analogized the Duncan release to the
invalid one in Lloyd v. Ray that purported to release "all other persons, firms, and corporations" in
a medical-malpractice claim. See id. at 419 (citing Lloyd v. Ray, 606 S.W.2d 545, 547 (Tex. Civ.
App.--San Antonio 1980, writ ref'd n.r.e.)).

The Rebel's release is different from those in Duncan and Lloyd because it expressly
lists Rebel's Honky Tonk and its "owners." (2) It does not merely refer to an unlimited, general class
of potential defendants. This release's reference to the owners of Rebel's Honky Tonk is sufficient
to identify Rainbow Cattle Company because Rainbow Cattle Company's identity and its connection
with the activity for which Thom signed this release is not in doubt. See, e.g., Winkler v. Kirkwood
Atrium Office Park, 816 S.W.2d 111, 113-14 (Tex. App.--Houston [14th Dist.] 1991, writ denied)
(concluding that plaintiff's release of "the Club" from any injuries sustained while participating in
center's programs clearly intended to release all individuals and entities involved in operation,
maintenance, and administration of center). It is undisputed, and even acknowledged by Thom in
his own pleadings, that Rainbow Cattle Company is the owner of Rebel's Honky Tonk.

Further, because Zack Truesdell was not served before the district court granted the
summary judgment, it is irrelevant whether he was named in the release; he was not a party
to this suit when the trial court granted the summary judgment. And even if he had been, for the
same reasons stated above, Zack Truesdell was covered by this release as an owner or agent of
Rebel's Honky Tonk.

We conclude that each of the Rebel's entities conclusively established its entitlement
to summary judgment on its affirmative defense of release.


Assumed risk

 Even if Rebel's were not entitled to summary judgment on its affirmative defense
of release, Rebel's also argued that Thom assumed the risks that led to his alleged injury, and that
it was entitled to summary judgment on this ground. Although assumption of the risk has been
abolished in ordinary negligence actions, see Farley v. M.M. Cattle Co., 529 S.W.2d 751, 758
(Tex. 1975), the defense remains viable in cases where a claimant knew of an activity's inherent
dangers and expressly consented to those dangers. See, e.g.,Willis v. Willoughby, 202 S.W.3d 450,
453 (Tex. App.--Amarillo 2006, pet. denied) (concluding that claimant contractually assumed risk
of engaging in self-defense instruction, which she expressly agreed was inherently dangerous
activity); Newman v. Tropical Visions, Inc., 891 S.W.2d 713, 718 (Tex. App.--San Antonio 1994,
writ denied) (citing Farley, 529 S.W.2d at 758). The effect of the assumed-risk defense is to negate
any duty owed to the plaintiff by the defendant to protect against foreseeable risks. See Adam Dante
Corp. v. Sharpe, 483 S.W.2d 452, 458 (Tex. 1972); Willis, 202 S.W.3d at 453.

 Thom contends that summary judgment based on the affirmative defense of assumed
risk was improper because Rebel's did not conclusively prove that Thom "knew of the inherent
dangers involved in riding a mechanical bull." Specifically, Thom argues that because he did not
read the release, he could not have known of the risks of riding the mechanical bull. We disagree. Before getting on the mechanical bull, Thom witnessed multiple people fall off of it.
In fact, he testified that he did not see anyone ride the mechanical bull without falling off at some
point. In his testimony, Thom agreed that falling is somewhat dangerous in any situation:


 Q: Would you agree with me that falling, no matter what the circumstances, always
entails a degree of risk?


A: Yes. 



Thom also saw posted signs on the wall near the mechanical bull that required everyone to sign a
document prior to riding the mechanical bull. Thom admitted that he knew he was signing a waiver
for injuries. Thom was also asked by the mechanical bull operator if he had any pre-existing injuries
that might make it unsafe for him to ride, which Thom denied despite his prior back problems. This
undisputed evidence shows that Thom was well aware of the risks involved with riding the
mechanical bull prior to riding it.

 Even if Thom did not recognize the inherent risks involved with riding a mechanical
bull just by watching other riders and other context clues, it is well established that one is
presumed to know the contents of the contract that they are signing and are bound by its legal effects.
See Missouri Pac. R.R. Co., 86 S.W.3d at 791; see also Estes v. Republic Nat'l Bank of Dallas,
462 S.W.2d 273, 276 (Tex. 1970) (concluding that absent fraud, failure to read contract before
signing it is generally not ground to avoid it). The first and second paragraphs of the agreement that
Thom signed explicitly detailed the risks and required Thom to acknowledge them, stating: 


I acknowledge that riding a mechanical bull entails known and unanticipated risks
that could result in physical or emotional injury, paralysis, death to myself, to
property, or to third parties. I understand that such risk simply cannot be eliminated
without jeopardizing the essential qualities to the activity.


THE RISKS INCLUDE, BUT ARE NOT LIMITED TO[]: Falling off of or
being thrown from the mechanical bull, which could result in muscu[lo]skeletal
injuries including head, neck and back injuries.


. . . .


I expressly agree and promise to accept and assume all of the risks existing with this
activity. My participation in this activity is purely voluntary and I elect to participate
in spite·of the risks.



(Emphases added.) Since one is presumed to know the contents of a contract that one signs,
see Missouri Pac. R.R. Co., 86 S.W.3d at 791, and because the risks are expressly identified and
accepted in the agreement, Thom had no excuse to be oblivious to the risks associated with riding
Rebel's mechanical bull. See Willis, 202 S.W.3d at 453 (concluding that because claimant signed
release containing provision expressly acknowledging inherent danger involved in self-defense
training and "knowingly and willingly assume[d] all risk of injury or other damage associated
with such training," contractual doctrine of assumed risk applied, effectively relieving defendant of
duty to protect claimant from foreseeable injury while providing instruction in self-defense). Here,
a foreseeable risk of injury accompanied riding a mechanical bull, Thom contractually assumed "all
of the risks," and chose to participate in mechanical bull riding in spite of such risks. Accordingly,
Rebel's was entitled to judgment as a matter of law on its assumed-risk defense. See id. at 454.
Thom's argument that the trial court erred in granting summary judgment on this ground is
unpersuasive.


CONCLUSIONHaving found that Rebel's conclusively established its affirmative defenses of release
and assumption of risk, we affirm the district court's summary judgment.



 __________________________________________

 Jeff Rose, Justice

Before Chief Justice Jones, Justices Rose and Goodwin

Affirmed

Filed: August 30, 2012

1. The Uniform Commercial Code's definition of "conspicuous" is codified in the
Texas Business and Commerce Code:


 (10) "Conspicuous," with reference to a term, means so written, displayed, or
presented that a reasonable person against which it is to operate ought to have noticed
it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous
terms include the following:



 (A) a heading in capitals equal to or greater in size than the surrounding text,
or in contrasting type, font, or color to the surrounding text of the same or
lesser size; and 

 

 (B) language in the body of a record or display in larger type than the
surrounding text, or in contrasting type, font, or color to the surrounding text
of the same size, or set off from surrounding text of the same size by symbols
or other marks that call attention to the language.


Tex. Bus. & Com. Code Ann. § 1.201 (10) (West 2009).

2. The Release expressly lists Rebel's Honky Tonk as a protected party and encompasses
Rebel's "agents, owners, [and] officers":



 In consideration of the services of REBELS HONKY TONK their agents, owners,
officers, volunteers, participants, employees and all other persons or entities acting
on behalf of myself, my spouse, my children, my parents, my heirs, assigns, personal
representative and estate . . .


(Emphasis added.)