**Opinion issued March 6, 2014.**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-12-00701-CV**

———————————

**WILLIAM FRANK DAVIS, Appellant**

**V.**

**CAROLINA DAVIS, Appellee**

---

**On Appeal from the 312th District Court**
**Harris County, Texas**
**Trial Court Case No. 1076420**

---

**MEMORANDUM OPINION**

This appeal arises from a dispute between Frank and Carol Davis over custody of their three children and the proper division of their property. During the divorce proceedings Carol testified that she had taken part in a religious wedding ceremony with Mohammad Iqbal Hozri several years before she married Frank and

that the marriage to Mohammad was never terminated through divorce. The trial court declared Frank and Carol's marriage void and divorced Mohammad and Carol. Then, against Frank's wishes, the trial court named Carol the primary conservator of the children, meaning she had the exclusive right to determine their residency. Also against Frank's wishes, the trial court enforced against him a mediated settlement agreement (MSA) dividing the couple's property.

In seven issues Frank challenges (1) enforcement of the MSA, arguing that he entered into the agreement before he realized his marriage was void and that the agreement should be void due to Carol's fraud, and (2) the trial court's decision to award primary conservatorship of the children to Carol in light of the testimony of the amicus attorney and court-appointed psychologist regarding the children's best interests. We affirm.

## Background

Frank and Carol married in 1998. In late 2010, Frank filed for divorce. One month before trial, the two entered into a MSA that divided the couple's property. The only issue left to be tried was custody of the children. Frank sought a joint managing conservatorship giving him the exclusive right to determine the children's residency. Carol, on the other hand, sought to be named sole managing conservator of the children, with Frank limited to supervised visitation.

2

The six days of trial were spread out over a two-month period. On the next-to-last day of testimony, Carol testified on cross-examination about her prior relationship with her oldest daughter's father, Mohammad Iqbal Hozri. She stated that she married him "through his religion . . . I am not sure too much about Muslim law; but, yes, it was a Muslim preacher the one that married us." When asked if she divorced him, she replied, "No. Because we didn't sign any documents. We didn't—we didn't get married signing—by signing of a document . . . we only got married through his religion. There is no document signed by the Texas law."

Frank's counsel continued questioning about the lack of divorce:

Q:    But you are clear that you were married under Muslim law?

A:    Yes.

Q:    And never divorced under the laws of the State of Texas?

A:    Not with my daughter's . . . father.

Q:    And, therefore, you are still married to Mr. Hozri today; aren't you, ma'am?

A:    What reason? What is the reason?

Q:    Because you were never divorced according to the laws of the State of Texas?

A:    We were not married through Texas law.

Q:    And you think because you got married somewhere else or under some other law that you don't have to get divorced?

A:    No. Because there is not any document that I signed or that we signed or that—that says that I have to get divorced because we signed because there is nothing that we signed.

Neither Frank nor Carol testified or contended that they thought the State still considered Carol to be married to Mohammad.

After one more day of testimony, Frank rested without requesting leave to amend his pleadings or seeking any relief from the parties' agreed property division. Then, after both parties rested, the trial court asked whether the MSA was in evidence; counsel agreed it was. Again, Frank did not argue that the evidence of Carol's unterminated marriage to Mohammad affected the MSA's enforceability. Frank did not raise the issue of property division or Carol's marriage to Mohammad in his closing argument.

Finally, after both sides concluded their closing remarks, the trial court raised the issue if the prior marriage impacted any other matters in the litigation:

> We actually have testimony undisputed evidence that Mrs. Davis was previously in a religious ceremonial wedding. There was no divorce. Under Texas law does that make the marriage a void marriage under Texas law, and I think that needs to be addressed. Based on that, we have to consider whether the Court under Texas law can grant a divorce in this case and whether or not Mrs. Davis may technically still be married to Mr. Hozri, the prior husband. I mean, that is something. So, I am raising the issue. I want to hear your positions on this.
>
> See, we may require some additional briefing because I don't know if that is something that even though it wasn't really argued I believe it was brought up on your cross-examination of Ms. Davis.

4

I was listening to see if there was to be any argument on it. There wasn't. You know, part of proving up a divorce is a proving up the marriage itself and then the required elements if you have a void marriage. I mean, that is something that needs to be addressed and that brings up the considerations also if the marriage—if this marriage is a void marriage.

Now, of course, the Court still has jurisdiction. It is appropriate still to determine custody, you know, Primary Conservatorship, child support and all that.

Do you have any immediate thoughts on this issue of whether or not the marriage is void to begin with and whether or not a divorce itself can be granted in this case?

Frank's counsel responded that "determination needs to be made" and "the attorneys probably need to have some very serious discussion about where we go with this issue." The parties agreed to provide the court with briefing within one week.

Three weeks later, Frank filed a First Amended Petition in Suit Affecting the Parent-Child Relationship. Frank's pleading states that the trial court had found, in the interim, that Carol was still legally married to Mohammad—making Mohammad the presumed father of the children—though the record does not contain the parties' briefing on the issue, a hearing transcript, or an order. Frank's amended petition admits paternity, requests that he be found to be the father of the couple's three children, and again, requests a joint managing conservatorship be created, with him having primary rights. Frank's pleading does not claim that Carol acted fraudulently. Nor does it seek to have the MSA set aside on the basis

5

of fraudulent inducement into contract. The pleading is completely silent on the issue of property division.

Over two months later, on May 4, 2012, the trial court held a hearing and rendered judgment divorcing Carol and Mohammad. After weighing the witnesses' testimony, his off-the-record interview of the couple's oldest child, and other evidence, the court appointed Frank and Carol joint managing conservators, noting that an extended visitation schedule would be appropriate. The court granted Carol the exclusive right to determine the children's residency.

After addressing conservatorship, the Court ruled: "The Court will approve the mediated disposition of the property as all parties have requested." Frank did not object.

Over one month later, on June 5, 2012, Frank filed a motion to set aside the MSA arguing—for the first time—that Carol "committed fraud" because she "induced [Frank] to enter into a Mediated Settlement Agreement to divide community interests, when she had never revealed that she was still legally married to Iqbal Hozri." Frank further argued that the MSA purporting to divide community property should be found void because the marriage underlying the agreement was void. That same day, Frank also filed a motion for new trial and "objection to entry of final order" seeking to have the MSA voided and to re-try the conservatorship and possession issues.

6

The trial court entered a decree declaring the Davises' marriage void, naming Carol primary joint managing conservator, and incorporating the MSA's division of the property. Frank appealed.

**Enforceability of MSA**

Texas law provides divorcing spouses with various options to divide their property. Section 7.006 of the Family Code allows the parties to execute a settlement agreement that may be "revised or repudiated" by either party before rendition of the divorce and that requires the presiding judge's approval of its terms. TEX. FAM. CODE ANN. § 7.006 (West 2006).[1] As an alternative method, the parties may choose to execute a mediated settlement agreement that

a)  prominently states, in boldfaced type or capital or underlined letters, that the agreement is not subject to revocation;

b)  is signed by both parties to the agreement; and

c)  is signed by the parties' attorneys, if any, who are present at the time the agreement is signed by the parties.

TEX. FAM. CODE ANN. § 6.602(b) (West 2006). An MSA that complies with these three requirements immediately binds all parties from the date it is signed. *Id.*; *see Spiegel v. KLRU Endowment Fund*, 228 S.W.3d 237, 241 (Tex. App.—Austin

---

[1]  "The agreement may be revised or repudiated before rendition of the divorce or annulment unless the agreement is binding under another rule of law . . . If the court finds that the terms of the written agreement in a divorce or annulment are not just and right, the court may request the spouses to submit a revised agreement or may set the case for a contested hearing." TEX. FAM. CODE ANN. §§ 7.006(a) and (c).

2007, pet. denied) (contrasting section 7.006 settlement agreements with section 6.602 mediated settlement agreements). No court approval is required. *In re Marriage of Joyner*, 196 S.W.3d 883, 889 (Tex. App.—Texarkana 2006, pet. denied). The parties cannot repudiate or revise their agreement. *Id.*; *Mullins v. Mullins*, 202 S.W.3d 869, 876 (Tex. App.—Dallas 2006, pet. denied) ("Unilateral withdrawal of consent does not negate the enforceability of a mediated settlement agreement in divorce proceedings."). This creates a procedural short-cut to the enforcement of the agreement—an advantage missing from the alternative section 7.006-style settlement agreement. *See Joyner*, 196 S.W.3d at 889. It also allows the parties to "settle their property as they see fit, keeping those matters out of the courtroom." *Id.*

Even with these statutory protections, an MSA can be voided if it is "illegal in nature or procured by fraud, duress, coercion, or other dishonest means." *Milner v. Milner*, 361 S.W.3d 615, 619 (Tex. 2012); *In re Kasschau*, 11 S.W.3d 305, 312 (Tex. App.—Houston [14th Dist.] 1999, orig. proceeding) (void for illegality); *Boyd v. Boyd*, 67 S.W.3d 398, 405 (Tex. App.—Fort Worth 2002, no pet.) (void for fraudulent concealment).

In four issues, Frank contends that the trial court erred in enforcing the MSA. He asserts that Carol fraudulently induced him to execute the MSA by failing to disclose her existing marriage to Mohammad. Related to this claim, he

8

asserts that no community property existed to be divided and that he would have sought a property division more favorable to himself if he knew the parties held different negotiating positions.[2]

## A. Standard of Review

A trial court's ruling on a motion to set aside a settlement agreement is reviewed under an abuse of discretion standard. *See In re C.H., Jr.*, 298 S.W.3d 800, 804 (Tex. App.—Dallas 2009, no pet.); *Mueller v. Mueller*, No. 01-11-00247-CV, 2012 WL 682285, at *2 (Tex. App.—Houston [1st Dist.] March 1, 2012, pet. denied) (mem. op.). As an initial matter, however, we must address whether Frank waived his right to challenge the MSA by failing to timely object to its enforcement, seek amendment of his pleadings, or request that the property be distributed in an alternative manner.

---

[2]  Frank submits these issues as follows:
(1) Did the trial court have jurisdiction over the parties' property or alternatively is the judgment on the MSA which divided marital property valid even though there were no pleadings to support said MSA and there was no trial by consent as to the division of any property?
(2) Under the facts and evidence presented in this case, could Appellee claim to be a putative spouse thus rendering the MSA valid?
(3) Did the trial court commit fundamental error when it approved a MSA under family code §6.602 where the MSA awarded wife reimbursement claims against husband's separate property and required Husband to pay wife additional monies after the signing of a "final decree of divorce" after wife admitted in final trial that she was married in violation of Tex. Pen. §25.01 (bigamy) with no valid defense and no facts presented that would qualify wife as a putative spouse?
(6) Did the trial court abuse its discretion by making the MSA enforceable after fraud was proven regarding the status of the marriage between the parties and the marriage declared void?

**B. Frank waived his arguments against enforcement**

Frank argues that his marriage was void based on Carol's "fraud" and "confessed bigamy." He asserts that the MSA also should have been voided because he was fraudulently induced into executing the MSA by Carol who was "lying to him and to members of her own family for many years about the status of her marriage to [Mohammad]."

While fraudulent inducement can be the basis for voiding an MSA, the defense must be raised timely or it is waived. TEX. R. APP. P. 33.1(a) ("As a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint was made to the trial court by a timely request, objection, or motion . . . ."); *see also Boyd*, 67 S.W.3d at 405. Fraud in the inducement is "in the nature of an affirmative defense"; therefore, the party seeking to avoid a contract bears the burden to support his claim with adequate pleading and proof. *Winkler v. Kirkwood Atrium Office Park*, 816 S.W.2d 111, 113 (Tex. App.—Houston [14th Dist.] 1991, writ denied).

Carol testified about her prior relationship with Mohammad on December 19, 2011, including that she went through a religious wedding ceremony yet never sought a divorce. Frank failed to request a continuance to address this evidence, to file a trial amendment to alter his allegations, assert new defenses, or seek different remedies, or to challenge the enforceability of the MSA that divided the couple's

10

property. He took no action at that time to repudiate the MSA based on fraudulent inducement; instead, he continued to litigate only the custody issue, indicating to the trial court that the property issue remained resolved under the terms of the immediately-effective MSA.

Even when the trial court raised the issue after closing arguments that the court might not be able to grant a divorce to Frank and Carol due to the prior relationship with Mohammad, Frank failed to repudiate the MSA. *Featherlax Corp. v. Chandler*, 412 S.W.2d 783, 788 (Tex. App.—Corpus Christi 1966, writ ref'd n.r.e.) (conduct inconsistent with repudiation of contract acts as ratification and waives right to fraud-based rescission). Frank's only response was to highlight the effect that the other marriage might have on paternity: "My greatest concern on that situation, your Honor, if, in fact, there was a finding that the previous marriage was still a valid marriage, then that would make him the presumed father of all of the Davis children. So, he would have to be named as a party in this lawsuit and at least sign a waiver to that effect."

About four months after this exchange, the trial court stated on the record, "The court will approve the mediated disposition of the property as all parties have requested." Again, no objection was made, and no effort to amend his pleading or assert a defense to the MSA can be found in the record. In fact, the first time Frank asserted he was fraudulently induced or otherwise indicated an intention to reject

11

the MSA occurred over one month after the court announced its approval of the property division and its decision regarding custody of the children.

Given Frank's failure to challenge the MSA or to claim fraudulent inducement during the nearly six months between Carol's testimony and the filing of the motion to set aside the MSA, we conclude that Frank waived this defense. TEX. R. APP. P. 33.1(a); *see also Cunningham v. Parkdale Bank*, 660 S.W.2d 810, 813 (Tex. 1983) (trial court commits error if it grants to party more relief than requested in that party's pleading); *Binder v. Joe*, 193 S.W.3d 29, 32 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Having found that Frank waived any challenge to the MSA's enforceability, we overrule issues one, three and six. Issue two—whether the MSA is enforceable under a theory that Carol qualifies as a putative spouse—likewise has been waived; however, we address it separately to clarify the relationship between that issue and the elements necessary to Frank's fraud claim raised in issue six.

## C.    Frank cannot establish an injury to prevail on the defense of fraud

Even without waiver, Frank would be required to establish an injury to prevail on his fraud defense: "[A]n essential element of actionable fraud sufficient for cancellation of a contract is injury . . . Some injury must be shown to constitute cause for rescission of a contract for fraud." *Featherlax Corp.*, 412 S.W.2d at 789.

Frank contends that binding him to the MSA causes him financial injury because he negotiated the agreement under a mistaken belief that he was married and that, as a result, most of the property at issue was community property subject to a just and right division. He suggests that—had he known the truth—he would have been less inclined to distribute as much property to Carol, who contributed little financially to their union.

Where this argument goes awry is in Frank's erroneous belief that a void marriage would have improved his negotiating position. Even with a void marriage, Carol, if found to be a putative spouse, would be entitled to the same just and right division as any other spouse. "While it is true that the family code does not expressly provide any guidance as to the disposition of property remaining after a marriage has been declared void, case law recognizes that, in one way or another, some disposition is required." *Ratliff v. King*, No. 03-08-00424-CV, 2009 WL 2837706, at *4 (Tex. App.—Austin Aug. 31, 2009, no pet.) (mem. op.) (citing *Dean v. Goldwire*, 480 S.W.2d 494, 496 (Tex. Civ. App.—Waco 1972, writ ref'd n.r.e.)); *see also Hovious v. Hovious*, No. 02-04-169-CV, 2005 WL 555219, at *6 (Tex. App.—Fort Worth Mar. 10, 2005, pet. denied) (mem. op.) (finding that putative spouses have same legal rights to community property as legal spouses). His negotiating position, in that instance, would not have improved. Thus, we

determine whether Carol was found to be a putative spouse, thereby negating Frank's fraud theory.

### 1. The trial court impliedly found that Carol was a putative spouse

In issue two, Frank asks whether Carol could claim to be a putative spouse (versus a meretricious spouse).[3] The more precise issue, though, is whether the trial court made a finding that she was a putative spouse.

Frank did not request that the trial court make findings of fact or conclusions of law. Nonetheless, an appellate court presumes that the trial court made all necessary findings to support its judgment when the objecting party failed to request them following a non-jury trial. *See Sink v. Sink*, 364 S.W.3d 340, 343 (Tex. App.—Dallas 2012, no pet.). If an implied finding is supported by the evidence, the appellate court upholds the trial court's judgment on any theory of law applicable to the case. *See id.* at 344.

---

[3] "A *putative* marriage is one that was entered into in good faith by at least one of the parties, but which is invalid by reason of an existing impediment on the part of one or both parties . . . The effect of a putative marriage is to give the putative spouse, who acted in good faith, rights to property acquired during the marital relationship that are analogous to those rights given to a lawful spouse . . . . A *meretricious* relationship or a 'live-in' relationship [is one in which] neither one of the individuals has a good faith belief that they are entering into a marital relationship. Each party is entitled to the property acquired during the relationship in proportion to the value that his or her labor contributed to its acquisition." *Ayala v. Valderas*, No. 02-07-134-CV, 2008 WL 4661846, at *4 (Tex. App.—Fort Worth Oct. 23, 2008, no pet.); *see also Weaver v. State*, 855 S.W.2d 116, 120 (Tex. App.—Houston [14th Dist.] 1993, no writ).

Frank argues that Carol cannot be considered a putative spouse because she was not "the innocent spouse" in forming their marriage. He explains, "After many years of claiming to be married to [Frank], Carol finally under oath admitted to bigamy." This assertion misstates Carol's testimony.

Carol testified that she did not believe the State of Texas recognized her marriage to Mohammad because they never filed any papers with the State, i.e., a marriage license. Instead, their marriage was merely ceremonial. She testified that she did not believe a legal divorce was necessary, either, because no papers were filed with the State. Frank did not present any evidence that Carol married him with knowledge that she had an existing, legally-recognized marriage to another person.

This situation is analogous to that in *Dean*, 480 S.W.2d at 495. In that case, the wife sought a divorce from her first husband through a Mexican court because she wanted to marry another man. She received an instrument written in Spanish— a language she could not read—and was told that it was a valid Mexican divorce decree. She thought the document made her "legally free" to remarry. *Id.* at 495. Only after receiving the Mexican document did she marry her second husband.

The second husband later sought to have their marriage declared void based on the prior marriage. He argued that she was not a putative spouse and had no equitable rights to the property obtained during their union. *See id.* at 495–96. He

15

obtained a summary judgment in his favor, and she appealed. The appellate court reversed, noting her statement in an affidavit that she "believed in good faith" that her second marriage was legal because her first marriage had been terminated through the Mexican divorce. *See id.* at 496. The court explained,

> A putative marriage is one that is invalid by reason of an existing impediment on the part of one or both spouses; but which was entered into in good faith by the parties, or one of them, good faith being essential. We hold that the required good faith may be based upon a bona fide belief in a Mexican divorce.
>
> . . .
>
> We hold that if either appellee or appellant believed in good faith that she had obtained a valid Mexican divorce from Dean and that she was therefore legally free to marry appellee at the time of their marriage, then the marriage was putative and remained such until they both learned that she was not divorced from Dean.

*Id.* at 496–97. This is in contrast to a "meretricious" relationship, where neither party has a good faith belief that they are entering into a legal marital relationship. *See Ayala v. Valderas*, No. 02-07-134-CV, 2008 WL 4661846, at *4 (Tex. App.—Fort Worth Oct. 23, 2008, no pet.) (mem. op.). Based on Carol's testimony about her good faith belief that her marriage to Mohammad had no legal effect and that her marriage to Frank was valid, the trial court made an implied finding that Carol acted in good faith and was a putative spouse. *See Dean*, 480 S.W.2d at 496–97. This implied finding is supported by the evidence and, as shown below, supports the judgment of the trial court. *See Sink*, 364 S.W.3d at 344.

16

## 2. Putative spouses are entitled to a just and right division

The *Dean* court explained the property rights a putative spouse has to property accumulated during a putative marriage:

> The laws relating to lawful marriages apply to property acquired by the parties to a putative marriage; and upon the dissolution of a putative marriage, or until discovery of the impediment, a putative spouse is entitled to share equally in the community property.

480 S.W.2d at 496. By contrast, in a meretricious marriage, "each party 'would own the property acquired in proportion to the value his (or her) labor contributed to the acquisition of it.'" *Id.* (quoting 1 SPEER, LAW OF MARITAL RIGHTS IN TEXAS § 58 (4th ed. 1961)).

Thus, as a putative spouse, Carol was entitled to the same "just and right" division of property she would have been owed had she been a lawful spouse in a valid marriage as she and Frank believed.[4] *See id.*; *see also Davis v. Davis*, 521 S.W.2d 603, 606 (Tex. 1975) (holding that decedent's putative wife was entitled to same right in property acquired during marital relationship as if she were his lawful wife); *Ayala*, 2008 WL 4661846, at *4. Accordingly, Frank is unable to show any

---

[4] The Decree Declaring Marriage Void entered by the trial court states as follows:
The Court finds that the following is a just and right division of the parties' estate, having due regard for the rights of each party, the children, and the mediated settlement agreement, which is attached to this Decree as Exhibit "A" and whose terms are incorporated herein by reference.

harm that resulted from negotiating the MSA while unaware that his marriage was legally void. His negotiating position was unaffected because Carol qualified as a putative spouse, unaware there was a legal impediment to her marriage to Frank.

Having already found that Frank waived his complaint that the MSA could be voided based on Carol's fraud and that Frank could not establish an injury to prevail on his fraud claim even if he were able to assert it, we overrule Frank's second issue.

### Variance between terms of MSA and Decree

In issues four and five, Frank challenges the trial court's revision of the MSA to reflect that the parties were not divorcing. His arguments are based on the legal principle that trial courts are prohibited from altering the terms of a divorcing couple's MSA. *Toler v. Sanders*, 371 S.W.3d 477, 480 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *Garcia-Udall v. Udall*, 141 S.W.3d 323, 330–32 (Tex. App.—Dallas 2004, no pet.).

Frank and Carol's MSA stated that Frank owed a payment to Carol "on the 120th day following date of signing of a final decree of divorce." Because their marriage was void and they could not be divorced, he argues, the condition precedent for payment—divorce—could not occur. Thus, he contends that the

impossibility of a "final decree of divorce" coupled with an inability to alter the wording on the MSA, left the MSA unenforceable against him.[5]

Frank's argument is similar to that made in *Beyers v. Roberts*, 199 S.W.3d 354, 362 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). There, the settlement agreement specified that the couple's child would transfer to Emmanuel Lutheran School mid-year, beginning January 2004. The school later informed the parents that the class was full, meaning the child could not transfer to the school until the following school year at the earliest. The court's order, entered after the MSA was executed, stated that the child would continue at his current school for the remainder of the school year. The father claimed "the trial court erred in rendering an order that was not in strict compliance with the settlement agreement." *Beyers*, 199 S.W.3d at 362. After noting the impossibility of the child attending the school specified in the MSA as well as the parents' agreement to the current school, this Court affirmed the trial court's order, holding that "[m]odifications to settlement agreements are typically grounds for reversal, however, only where they add terms,

---

[5] Frank frames his issues in this regard as follows:
(4)   Did the trial court violate Appellant's right to due process by inserting language in the final order modifying the MSA to significantly alter the original term of "final decree of divorce" to mean "Decree Declaring the Marriage Void"?
(5)   Was the trial court authorized under the Family code to modify, add, or significantly alter the original term of the MSA of "final decree of divorce" to mean "Decree Declaring the Marriage Void"?

significantly alter the original terms, or undermine the intent of the parties." *Id.* at 362.

A court's ability to enter a decree that alters the terms of an MSA also was challenged in *Haynes v. Haynes*, 180 S.W.3d 927 (Tex. App.—Dallas 2006, no pet.). The parties executed an MSA providing that the wife would get sixty percent of the husband's non-transferable employee stock options. The wife's attorney prepared the agreed final divorce decree, which contained detailed procedures for the exercise and division of the stock options and made the husband a constructive trustee for the wife's benefit. The husband challenged the settlement on appeal, arguing that the trial court "had no authority to enter a judgment that varied from the terms of the mediated settlement agreement." *See id.* at 929. While recognizing that courts may not add terms to an MSA that alter the parties' agreement, the court ruled that terms that are necessary to "effectuate and implement" the parties' agreement without affecting the agreed substantive division of property "may be left to future articulation by the parties or consideration by the trial court." *Id.* at 930 (citing *McLendon v. McLendon*, 847 S.W.2d 601, 606 (Tex. App.—Dallas 1992, writ denied)). The court found determinative that the decree remained consistent with the parties' intent, varying only in the mechanism of dividing the estate:

> A trial court has no power to supply terms not previously agreed to by the parties; however, the parties here agreed to the material terms of

their property division and nothing in the divorce decree varies from that agreement. The divorce decree's provisions implementing and effectuating the agreed division of the options do not vary the terms of the mediated settlement agreement; rather, they carry those terms into effect. Thus, the trial court did not supply terms to which the parties had not agreed.

*Id.*

The proper inquiry under *Beyers* and *Haynes* is not a mechanical examination of whether the divorce decree varies from the terms of the MSA. Rather the inquiry is whether variances by the trial court significantly alter the parties' written agreement in a way that deviates from the parties' intent as manifested in that agreement. If the decree merely adopts mechanisms to enforce the parties' agreement while remaining consistent with their intent, it is enforceable.

We have already concluded that the trial court made an implied finding that Carol was a putative spouse, based on her testimony that she did not understand her ceremonial marriage to Mohammad to have any legally-recognized import and, consequently, was unaware there was a legal impediment to her marriage to Frank. This finding made Carol a putative spouse in the eyes of the law—entitling her to the same just and right division of property as any other spouse. Thus, Frank was without any mechanism to improve his negotiating position or re-do his agreement based on later-obtained information. The question, then, is whether, in light of

21

Carol's status as a putative spouse, the variance to the MSA made by the trial court deviated from the parties' intent when they divided their property.

The MSA provided that Frank would transfer to Carol $21,559 no later than 120 days following the completion of their legal dispute. While the MSA expressed that event as the signing of a "final decree of divorce," the judgment actually entered was a "decree declaring marriage void."

Similar to the *Beyers* case, Frank and Carol's MSA mandated an action that could not be achieved. Just as the Beyers' child could not attend Emmanuel Lutheran, Frank and Carol could not get divorced. The trial court altered the terms of Frank and Carol's decree only to the extent necessary to effectuate their intent that Frank transfer funds to Carol once their legal dispute resolved. The court included the following language to correct the issue:

> For purposes of construction, application, and enforcement of the mediated settlement agreement, and notwithstanding the Court's finding that there was no marriage between the parties, it is ORDERED that this Decree shall be construed as a "final decree of divorce" as the term is used in the mediated settlement agreement.

We hold that this provision (1) was limited to that necessary to effectuate and implement the terms to which the parties had agreed, and (2) did not alter the terms of the MSA in a manner inconsistent with the parties' intent. *See Beyers*, 199 S.W.3d at 362; *Haynes*, 180 S.W.3d at 930; *see also In re Lee*, 411 S.W.3d 445, 458 n.17 (Tex. 2013) (holding that "to the extent there is no dispute about the

22

parties' intent, the trial court has discretion to provide clarification of this or any other provision" in MSA).

We overrule issues four and five challenging the trial court's modification of the terms of the MSA in the final decree.

## Conservatorship

In his final issue, Frank argues that the trial court abused its discretion by granting to Carol the exclusive right to determine the children's residency. He contends that the award was inconsistent with the recommendation of the amicus attorney, court-appointed psychologist, and the evidence.

### A. Standard of Review

Trial courts have wide discretion to determine a child's best interest, including issues of custody, control, possession and visitation. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *Holley v. Holley*, 864 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1993, writ denied). This is because the trial court is in the best position to observe the demeanor and personalities of the parties and witnesses and to evaluate credibility, influences, and other forces that are not discernible from a cold record. *In re Herd*, 537 S.W.2d 950, 952 (Tex. App.—Amarillo 1976, writ ref'd n.r.e.); *In re T____*, 715 S.W.2d 416, 418 (Tex. App.—Dallas 1986, no writ); *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied). Appellate courts will reverse a trial court's determination of

conservatorship only if a review of the entire record reveals the trial court's decision was arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Patterson v. Brist*, 236 S.W.3d 238, 239–40 (Tex. App.—Houston [1st Dist.] 2006, pet dism'd). A trial court does not abuse its discretion "as long as some evidence of a substantive and probative character exists to support the trial court's decision." *In re W.M.*, 172 S.W.3d 718, 725 (Tex. App.—Fort Worth 2005, no pet.). Further, the evidence is viewed in the light most favorable to the trial court's decision, and every legal presumption is indulged in favor of its judgment. *Holley*, 864 S.W.2d at 706.

Frank, the appellant, did not request findings of fact or conclusions of law. In that circumstance, we "presume that all factual disputes were resolved in favor of the trial court's ruling." *Aduli v. Aduli*, 368 S.W.3d 805, 813 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Thus, the trial court's ruling will be upheld unless "it is so contrary to the overwhelming weight of the evidence as to be wrong and unjust." *Id.* at 814; *see also Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

## B.      The trial court did not abuse its discretion

Frank sought a joint conservatorship, but requested the exclusive right to determine the children's residency. He and Carol, along with their witnesses, testified about the interactions each parent had with the children, their home

environments, and their interactions with each other. Additionally, the trial judge interviewed the couple's oldest child in chambers to ascertain her views and wishes. There is evidence to support the trial court's decision to grant Carol the exclusive right to determine residency of the children, including the following:

- Carol testified that she was involved in the children's education, schooling, and medical care and that she addressed their needs;

- Carol's sister testified that Carol had a positive relationship with the children and cared for their needs well;

- Carol maintained an apartment that was described as more than adequate for the children;

- There was no indication that the children disliked being at their mother's home;

- There was testimony that Frank had a temper and that Carol had bruising and injuries after a physical confrontation between them;

- The trial court interviewed the couple's oldest daughter, who spoke positively about both parents; and

- Their oldest daughter repeatedly indicated to the psychologist that she preferred to reside with her mother.

Accordingly, we conclude there is evidence to support the trial court's determination and the trial court did not abuse its discretion designating Carol as primary conservator. *Cf. In re Anglin*, 542 S.W.2d 927, 933 (Tex. App.—Dallas 1976, no writ) ("Although a minor child's desires are not controlling on the court, other things being equal, they should be considered in determining the custody

unless it is shown that an adverse party has purposely influenced the child's decision.").

Frank argues that the recommendation of the amicus attorney and concerns raised by the court-appointed psychologist required an alternative conservatorship arrangement. We disagree. The amicus attorney did recommend that Frank have the exclusive right to determine residency; however, she clarified that her recommendation was based on her belief that Frank was more likely than Carol to facilitate communication between the parents. She also said that "[t]hey were both very involved in the upbringing and the decision making for the children" and that, while they did not work well together at the time of the divorce, "[h]istorically the parents have worked well together." The overall tenor of her remarks did not strongly favor Frank over Carol, and the trial court was free to decide the issue of residency opposite her recommendation. *Cf. Gillespie*, 644 S.W.2d at 451 (noting wide latitude given trial court to determine best interest of child).

Likewise, the psychologist did not strongly favor Frank over Carol. She testified that Carol had shown concern for her children and that Carol "wanted to do whatever was best for the children." Further, she testified that she thought both Carol and Frank would follow her instructions concerning effective parenting techniques. She also noted Carol's willingness to participate in the children's therapy. Furthermore, the oldest daughter "consistently expressed that she would

prefer to be at Mom's house" in her meetings with the psychologist. When asked if she had any concerns with either parent being named primary conservator she replied, "No, not at this time."

Frank contends that these two professionals were critical of Carol's parenting as it related to a video he found on one of the kids' electronic devices. He states that the psychologist "expressed serious concerns," including "concerns about the supervision that was going on" when the video was made during Carol's possession of the children. In the video, the couple's daughters, along with the girls' older male cousin, were laughing as one of the daughters imitated actions that were not age-appropriate and had sexual significance. The video was made in a bedroom of Carol's apartment; Carol was in another room at the time.

While Frank is correct that the psychologist and amicus attorney discussed in court the video and the various family members' reactions to it, the professionals did not conclude that the existence of the video argued against Carol being named primary conservator.

The psychologist testified that Carol appeared appropriately concerned about the video. The psychologist's negative views were more related to the blasé attitude the children displayed about what transpired on the video rather than a criticism of either parent's reaction to it. Likewise, the amicus attorney's closing remarks, to the extent they related to the video, were focused on whether an on-

going injunction prohibiting the children from contact with the cousin would be necessary.

At the conclusion of the trial, the court found that both parents exhibited "a mutual interest" in doing what would be in the best interest of their children. He stated that both parents qualified as managing conservators, but that it was required that only one be granted the exclusive right to determine residency. "I believe you both want the best for them and that they are in good hands with either of you . . . both of you are still going to have a lot of time with your children . . . ." The trial court concluded that, "considering all the factors involved . . . both parents should be named as joint managing conservators, but . . . Carol [should have] physical primary possession of the children, primary custody. However, I would—and I'm open to even an extended type of—working out some type of a visitation and schedule that we can maximize the interaction with both parents."

After reviewing the entire record, we conclude that the trial court had sufficient evidence to exercise its discretion to appoint Carol as the conservator with the exclusive right to designate the children's residence and the trial court's decision was reasonable. *Strong v. Strong*, 350 S.W.3d 759, 764–68 (Tex. App.—Dallas 2011, pet. denied) (although some evidence favored father, there was evidence to support award of primary custody to mother); *cf. London v. London*, 94 S.W.3d 139, 149–50 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (holding

28

that joint conservator with right to decide residency does not necessarily also have right to more time with children). Accordingly, the evidence does not show that the trial court abused its discretion, and we overrule issue seven.

## Conclusion

Having overruled all of Frank's seven issues, we affirm the trial court's order.

Harvey Brown
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

Justice Jennings, concurring in judgment only.